**Mary Catherine WILLIAMS, as Administratrix of the Estate of James Michael Williams, deceased, and as guardian ad litem for Aaron Seth Williams, an infant, suing in his own right**

v.

**The CITY OF LANCASTER, PENNSYLVANIA, the City of Lancaster Pennsylvania Bureau of Police, et al.**

Civ. A. No. 85–1059.

United States District Court,
E.D. Pennsylvania.

June 18, 1986.

Sanford F. Young, Samuel Abloeser, Philadelphia, Pa., for plaintiff.

James K. Thomas, III, Harrisburg, Pa., for defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Plaintiff Mary Catherine Williams brought this civil rights and wrongful death action against the City of Lancaster, the Lancaster Bureau of Police, and various individual police officers. She seeks to recover damages for the death of her brother James Michael Williams, who hung himself in his cell at the Lancaster police station on March 5, 1983. Defendants have moved for summary judgment on the federal claims. For the reasons explained below, I will grant their motion as to the federal claims, and will dismiss the other counts as well.

## I. INTRODUCTION

This action arises out of decedent's arrest in the early morning of March 5, 1983 for allegedly tripping a false fire alarm. Shortly after his arrest, decedent was transported to the Lancaster police station, and placed in a holding cell. A few hours later, he was found in the cell, hanging by his shirt. Plaintiff contends that her brother's civil rights were violated in the following ways: there was no probable cause for his arrest; he was subjected to cruel and unusual punishment; defendants exhibited reckless disregard for his safety; and defendants conspired to deprive him of his liberty.

## II. FACTS

During the evening of March 4, 1983, and into the early morning of the next day, decedent, his brother, and some male friends visited several clubs in Lancaster as part of a bachelor celebration. The celebration was a prelude to the March 5th wedding of John Mark Williams, decedent's brother. The men, decedent included, consumed alcoholic beverages during the bach-

elor party, and decedent was obviously intoxicated at the time of his arrest.

At about 1:00 a.m. on March 5th, a fire alarm was triggered on the second floor of the Duke Street parking garage in Lancaster. The garage attendant, who was in a booth on the first floor, noticed a group of young men in the garage just before the alarm sounded. Within seconds after the alarm was activated, the attendant observed a man in a brown jacket exit from the elevator and join the others, who then left the garage. Shortly thereafter, police and fire department personnel arrived on the scene. They determined that no fire had occurred; they reset the alarm; and they spoke to the garage attendant. Hearing his story of the group of young men, they advised him to notify the police should the men reappear. Then, the policemen and firemen left the garage.

Approximately an hour later, the same group of young men—decedent, his brother, and friends—drove up to the parking attendant's booth, seeking to exit from the garage. Using the pretext that the gate was malfunctioning, the attendant prevented their exit, and called the police. Soon, police and fire department personnel returned to the garage. Defendant Samuel Gatchell, a police officer, spoke to the attendant, who confirmed that these were the men whom he had seen earlier. The attendant also pointed out decedent as the man in the brown jacket.

Gatchell explained the situation to the group—that they were suspected of setting off the alarm—and each man jokingly admitted having activated it. According to the officers' uncontradicted accounts, the group appeared cheerful and cooperative. There is no indication in the record that anyone asked to leave or complained about being detained.

A few minutes after Gatchell's arrival, fire department officials appeared with an ultra-violet light, designed to detect the presence of fluorescent paste. Each alarm box in Lancaster is coated with fluorescent paste that adheres to any object that comes in contact with it. This paste is invisible in ordinary light, but registers under ultra-violet rays. With at least five officers from the police and fire departments looking on, the ultra-violet light was shone on the hands of each member of the group. Traces of fluorescent paste were detected on decedent's hands only.

As a result of the attendant's identification and of this test, Gatchell arrested decedent, who was a 26–year-old student with no criminal record. Gatchell took Williams to the police station, there advising him of his constitutional rights. Williams acknowledged that he understood his rights. At the station, decedent was again examined under ultra-violet light, and the presence of fluorescent paste was again visible. Gatchell then "booked" Williams, and took him to a holding cell at about 3:00 a.m.

Before going to the cell, decedent spoke to his brother, telling him that he was "okay." According to the unrefuted testimony of the officers, Williams appeared neither angry nor upset, although he was obviously intoxicated. The police confiscated Williams' belongings, including the medicine he took for his asthma. Decedent never complained that he was in need of that medicine, or of medical attention.

Williams was placed in a single cell next to one containing another prisoner named Dwayne Sourbeer. No one else was present in the cellblock at the time. It was the duty of defendant officer John Beam to check the cells every half-hour, as required by state regulations. Beam checked Williams four times between his arrival and 5:00 a.m. At that time, Beam left the station to feed the police horses—another one of his regular duties.

During his checks of the cells, Beam talked with Williams, who seemed in good spirits. Beam informed him that, at 6:00 a.m., he would go before a magistrate, who would set his bail. According to Beam, decedent did not act especially distressed by this news. Beam returned to the station at approximately 5:45 a.m., did some paper work in Williams' case, and then went to the cellblock. Shortly before 6:00 a.m., Beam found Williams hanging by his

shirt in his cell. Efforts to revive Williams failed, and he was pronounced dead soon afterward. An autopsy showed the cause of death to be suicide, and found Williams to have been intoxicated.

Sourbeer, who was admittedly intoxicated while in jail, told the police that he heard a gagging noise coming from the adjoining cell. Sourbeer could not see decedent, but supposed him to be in distress. In order to call help, Sourbeer banged loudly on the bars of his cell but no one appeared. Sourbeer did not call out, however. Sourbeer also testified that between 30–45 minutes later, an officer came into the cellblock, yelled "holy shit," ran into the next cell, and pulled out decedent's body.

### III. DISCUSSION

In ruling on this motion for summary judgment, I must resolve all inferences to be drawn from the facts in favor of plaintiff, the non-moving party. *Continental Insurance Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982). And I may grant summary judgment here only if it is established that there is no genuine issue as to any material fact and that defendants are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Small v. Seldows Stationery*, 617 F.2d 992, 994 (3d Cir.1980). But once the moving party has supplied sufficient affidavits in support of its motion, summary judgment should be granted unless the opposing party responds by setting forth specific facts demonstrating that there is a genuinely disputed factual issue. *Fireman's Insurance Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982). These facts must be set forth in affidavits or other exhibits, made upon personal knowledge; Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions." *Id.*

Plaintiff has brought this action, pursuant to 42 U.S.C. § 1983, alleging that the police department and officers violated her brother's constitutional rights. Specifically, she claims the following: that his rights under the fourth and fourteenth amendments were infringed by an arrest without probable cause; that his eighth amendment right to be free from cruel and unusual punishment was violated; that he was deprived of life without due process; and that defendants conspired to violate his civil rights. In any action brought under section 1983, "the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981). There is no question that the officers here acted under color of state law. But I find that plaintiff has failed to demonstrate any infringement of a constitutional right sufficient to state a claim under section 1983.

#### A. *Probable Cause*

Plaintiff contends that her brother's arrest was constitutionally deficient in two respects: first, there was no probable cause for his initial detention; and second, the ultraviolet light test was an illegal search. In order to evaluate these allegations, I must apply the federal standards concerning investigatory stops and probable cause for arrest.[1] As the Supreme Court has said, the fourth amendment "is not, of course, a guarantee against *all* searches and seizures, but only against unreasonable searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985) (emphasis in original). I must, therefore, consider the reasonableness of Officer Gatchell's actions. And I must go through a two-step analysis, reviewing Gatchell's con-

---

1. Insofar as I must apply federal law, I will decline plaintiff's suggestion that I consider Pennsylvania law about probable cause. Although Pennsylvania may apply differing standards of probable cause for felonies and for misdemeanors, federal law does not recognize that distinction. *See Diamond v. Marland*, 395 F.Supp. 432, 440 (S.D.Ga.1975).

duct when he first detained the group for questioning and then when he arrested Williams.[2]

### 1. *Investigatory Stop*

When Gatchell first questioned the group, he knew that the attendant had identified them as the only persons in the garage (to his knowledge) at the time when the fire alarm was pulled. Based on that information, Gatchell made a brief, investigatory stop. He asked the men about the fire alarm, and each individual jokingly admitted that he had triggered it. No one denied pulling the alarm, and no one objected to the inquiry. By all accounts, this questioning took no more than a few minutes.

 The investigatory stop was proper if "the officer's action was justified at its inception, and ... it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). Under the first prong of this test, less than probable cause is required to justify an investigatory stop: "It is well established that an investigatory stop short of an arrest is valid if based upon a reasonable suspicion that criminal activity is afoot." *United States v. Rickus*, 737 F.2d 360, 365 (3d Cir.1984). This is so because an investigatory stop is regarded as decidedly less intrusive than an arrest. In this situation, Gatchell stopped the group only after the attendant had made an eyewitness identification of them as the only ones present at the time of the alarm. Such information does not inevitably implicate the men, but it does constitute "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion"—i.e., the stop. *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. Furthermore, by acknowledging (albeit kiddingly) that

they had pulled the alarm, the men gave Gatchell a reason for continuing to question them.[3]

Under the second part of the *Terry* test, the stop must be brief and less sweeping than a full-scale interrogation. In attempting to fashion the guidelines for a permissible stop, the Supreme Court recently approved a twenty-minute detention where the police had acted diligently:

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

*United States v. Sharpe*, 105 S.Ct. at 1575. The initial stop here was brief, taking less than ten minutes (according to undisputed police records). It lasted only as long as necessary to perform the ultra-violet light examination. In addition, there has been no suggestion that anyone ever objected to the procedure or to the delay. In light of these factors, I cannot say that the detention was too long to qualify as an investigatory stop. Neither can I say that Gatchell had no reason to be suspicious of this group. The investigatory stop was, thus, appropriate.

### 2. *Ultra-Violet Test and Arrest*

"A police officer may arrest a person if he has probable cause to believe that person committed a crime." *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). Plaintiff complains that her brother's arrest was improper because of the lack of this essential element of probable cause. She claims that probable cause for the arrest was absent because administration of the black light test was illegal. I find, however, that the mere examination of decedent's hands un-

---

**2.** Plaintiff urges me to treat the parking attendant's refusal to permit the group's exit as the beginning of the investigatory stop. But the attendant, a private citizen, was not acting under color of state law.

**3.** The government has not raised this point, but I think it likely that the obvious intoxication of his suspects gave officer Gatchell another reason for detaining them.

der the ultra-violet light was permissible, for it did not violate a privacy interest protected by the fourth amendment.

■ The obtaining of physical evidence from a person implicates a fourth amendment right only when "the bodily seizure requires production of evidence below the body surface which is not subject to public view." *In re Grand Jury Proceedings*, 686 F.2d 135, 139 (3d Cir.), *cert. denied, Mills v. United States*, 459 U.S. 1020, 103 S.Ct. 386, 74 L.Ed.2d 517 (1982) (allowing compelled production of hair samples). The Supreme Court has prohibited forced invasions below the body's surface, such as blood samples, *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and fingernail scrapings, *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). But the Court has held that the fourth amendment "provides no protection for what 'a person knowingly exposes to the public.'" *United States v. Dionisio*, 410 U.S. 1, 14, 93 S.Ct. 764, 771, 35 L.Ed.2d 67 (1973) (permitting voice exemplars). Williams had no reasonable expectation of privacy regarding the surface of his hands, which were exposed to the view of all about him. Although the ultra-violet light disclosed fluorescent traces invisible to the public, the mere shining of this light did not involve an intrusion below the bodily surface. The black light examination was, thus, not a search within the meaning of the fourth amendment.[4]

■ There is little question that Williams' arrest was justified based on the result of the ultra-violet test. Plaintiff stated that the "positive" fluorescent reading might have been caused by chemicals which decedent used in a college lab experiment. Assuming that possibility to be real, probable cause for the arrest existed, nonetheless. The fourth amendment does not require a definite determination of guilt but merely a "reasonable belief" that an offense had been committed. *United States v. Glasser*, 750 F.2d 1197, 1206 (3d Cir.1984), *cert. denied, Erdlen v. United States*, —— U.S. ——, 105 S.Ct. 2025, 85 L.Ed.2d 306 (1985), *Gaza v. United States*, —— U.S. ——, 105 S.Ct. 2148, 85 L.Ed.2d 504 (1985). Based on the black light test, Officer Gatchell held a reasonable belief that Williams had pulled the fire alarm.

Williams' constitutional rights were, therefore, not violated by Officer Gatchell; probable cause existed during the entire period that he was detained—the investigatory stop, the ultra-violet examination, and the arrest.

### B. *Cruel and Unusual Punishment*

■ Plaintiff asserts that her brother's eighth amendment right to be free from cruel and unusual punishment was infringed by his imprisonment for a minor offense. It is well settled, however, that the constitutional ban on cruel and unusual punishment does not pertain to pre-trial detainees, such as Williams. *Whitley v. Albers*, —— U.S. ——, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986); *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979). There is, therefore, no basis for plaintiff's eighth amendment claim.

### C. *Due Process*

According to the complaint, Williams' due process rights were violated during his imprisonment by the following occurrences: (1) the confiscation of his asthma medicine; (2) the failure to have him examined by a physician; (3) the intentional disregard of loud banging noises made by Sourbeer; (4) the assignment of the same officer to check the cells and to feed the horses; and (5) the decision not to install video surveillance equipment. In addition, in her memorandum in opposition to the summary judgment motion, plaintiff, for the first time, makes the suggestion that Williams' death may not have been a suicide. She claims that defendants conspired to cover up the

---

**4.** There is also the possibility, never contradicted by plaintiff, that Williams and his friends consented to the ultra-violet examination. According to official records, the men did not object to the procedure.

true cause of her brother's death. I have considered each of these charges, and find every one to be without merit.

Before studying these allegations, it is well to remember that the Supreme Court has recently reinterpreted section 1983, finding that mere negligence does not give rise to a fourteenth amendment deprivation: "Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty or property." *Daniels v. Williams,* — U.S. —, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) (emphasis in original); *accord Davidson v. Cannon,* — U.S. —, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). In order to prevail on her due process claim, plaintiff thus must demonstrate that defendants intentionally or recklessly injured her brother.

### 1. *Alupent*

■ Confiscation of an incarcerated individual's belongings is standard police procedure. Plaintiff has failed to support her claim that defendants took the Alupent asthma medicine from Williams in an attempt to cause him distress or harm, and defendants have submitted affidavits refuting that allegation. According to defendants, Williams never asked for his medicine, nor complained of medical problems. If such were the case, defendants could not have been acting to injure Williams, for they would not even have known of his asthmatic condition. At most, their confiscation of decedent's medicine was negligence, and thus not actionable under section 1983.

### 2. *Medical Examination*

■ Plaintiff contends that defendants exhibited disregard for her brother's health by failing to have him examined by a physician, despite his obvious intoxication. Plaintiff notes that state regulations call for medical examinations of all "suspected inebriates." Rules and Regulations for Municipal Jails 3 (Jan.1972). As with the prior complaint, defendants' failure to follow this guideline cannot be termed more than negligence. According to the record, Williams never asked to see a physician, never complained of medical problems, and exhibited no signs of either mental or physical distress. Also, despite his intoxication, Williams was conscious, and understood what was going on about him. He conversed with the officers and with his brother, assuring all that he was "okay." Under these circumstances, the officers' failure to seek out medical care cannot be said to be a deliberate or reckless indifference to Williams' health and safety.

### 3. *Banging Noises*

■ In an unsworn statement, prisoner Sourbeer claims to have banged loudly on the bars of his cell in an effort to summon assistance for Williams. Plaintiff points out that the loud noises from the cellblock must have alerted defendants to a problem there. She then alleges that defendants must have known that Williams was in trouble and must have made a deliberate decision not to come to his aid. But this contention is unconvincing for two reasons. First, Sourbeer's statement is unsworn and, as such, not entitled to any weight in this decision. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 1608 n. 17, 26 L.Ed.2d 142 (1970); Fed.R. Civ.P. 56(e). Second, Sourbeer never stated that he yelled or in any other way indicated that an emergency was occurring. In fact, Sourbeer himself did not know what was happening. As a result, defendants were not aware that Williams needed their immediate help. Under these circumstances, defendants could not have known of the seriousness of the situation, and their failure to respond to the supposed sounds was mere negligence.

### 4. *Assignment Duties*

■ Beam, the officer in charge of checking on the prisoners in the cellblock, did so at half-hour intervals, as required by state regulations. Rules and Regulations for Municipal Jails 3. But at 5:00, Beam left the jail so that he could feed the police horses—another of his regular duties.

Plaintiff objects to this dual assignment of duties to Beam as necessarily violative of the requirement that prisoners be checked every thirty minutes. Although it is true that Williams went unchecked for about an hour, the failure to monitor him during that period was again merely negligent. Beam returned from feeding the horses by 5:45, and could have looked in on the prisoners then. Instead, he chose to do some paper work relating to Williams' scheduled appearance before the magistrate. His decision to do that paper work rather than to check Williams was perhaps ill-advised, but there is no evidence of total indifference to decedent's safety. In fact, Beam has said that he spoke to Williams shortly before leaving the station in order to reassure him that he would be released shortly. At that time, Beam observed no signs of mental distress in Williams.

■ In addition, the police department's decision to assign the horse feeding task to the officer in charge of prisoner checks does not rise to the level of a section 1983 violation. Although it took Beam 45 minutes to feed the horses on this night, there is no evidence that the job could not be done in a shorter time, or that Beam could not have asked another officer to check on the prisoners. In fact, Gatchell has said that he was in an adjacent room during this time, and other officers were presumably present in the station. Furthermore, even if one check were missed on a regular basis, plaintiff has failed to show how that hour-long gap is anything more than negligence. A brief departure from the jail regulations does not automatically impinge upon prisoners' constitutional rights.

### 5. *Video Surveillance*

■ Plaintiff argues that defendants should have installed a video surveillance system in the jail because of the number of suicides that had occurred there in the past. Assuming that suicide were a persistent problem in the jail, the police department was nonetheless under no duty to install a video surveillance system. The suicide problem was not of defendants' making, and the police were not obligated to take the step of installing an elaborate suicide-prevention system. Plaintiff confuses defendants' duty under section 1983. Her argument, if taken to its logical conclusion, suggests that defendants would be strictly liable for all suicides in the jail simply because they did not implement such a system. Defendants cannot be held responsible either for devising a solution to the suicide problem, or for spending the money required to carry it out.

### 6. *Cause of Death*

■ In her opposition to the summary judgment motion, plaintiff has suggested for the first time that her brother's death may not have been a suicide. The only evidence that she offers on this point is an affidavit from Alan Green, a physician who reviewed the autopsy report. Dr. Green said that the "finding of lividity around the face would be inconsistent with the death by hanging as lividity is a medical term which refers to the coloration of the body that results from the settling of the blood in the portions of the body closest to the ground due to gravity." Green Affidavit ¶ 10. In other words, the doctor, who did not examine the body or any photographs of it, finds it unlikely that Williams' death was a suicide because some blood had settled around the face. Yet, as the police have testified, Williams' body was taken down shortly after death, and efforts were undertaken to revive him. During these procedures, it is possible that some blood might have settled around the face. Also, Dr. Green does not disagree that the other autopsy findings are consistent with a death by hanging. And the testimony of Sourbeer—who heard a gagging noise from decedent's cell, and then heard the surprised exclamation of Officer Beam when he discovered the body—further supports the view that the cause of death was suicide. In light of the overwhelming proof of suicide, I find that no factual issue exists as the cause of death.

## D. *Conspiracy*

In every respect, plaintiff has failed to show any infringement of her brother's constitutional rights. I, therefore, find that defendants could not possibly have conspired to deprive Williams of his civil rights, and I will grant defendants' motion as to this count.

## IV. CONCLUSION

Because plaintiff has not shown any way in which defendants' conduct violated one of her brother's constitutional rights, the motion for summary judgment on the federal claims will be granted. And I will dismiss the remaining pendent state law claims for want of a federal question.