Elizabeth KOCIENSKI, Individually and as Administratrix Ad Prosequendum of the Estate of Helen Garity, Deceased, Plaintiff,

v.

CITY OF BAYONNE, a Municipal Corporation, County of Hudson, a body politic under the laws of the State of New Jersey, Larry A. Butler, Chief Warden of the County of Hudson, Eugene McCoy, the Bayonne Police Department, James Sisk, Chief of Police, Joseph Pellichio, Director of Public Safety, Police Officer Mark Smith, Police Officer David Markowski, Lieutenant Sullivan and Police Officers John Klimek, and Lieutenant Robert McCarthy, and Police Officers John Does 1–10, being fictitious names, Defendants.

Civ. A. No. 90–1930 (MTB).

United States District Court,
D. New Jersey.

Feb. 22, 1991.

Shulman & Wall by Thomas J. Wall, Edgewater, N.J., for plaintiff.

Adubato & Jaffe by Michele A. Adubato, Bayonne, N.J., for defendants Sisk, Sullivan, Markowski, Smith, McCarthy and Klimek.

OPINION

BARRY, District Judge.

## I. INTRODUCTION

Plaintiff Elizabeth Kocienski ("Kocienski") instituted this action on May 14, 1990 against the City of Bayonne, the County of Hudson and various other city and county officials, both on behalf of herself and as Administratrix ad Prosequendum of the estate of her sister, Helen Catherine Garity ("Garity"). Garity committed suicide in the Bayonne Municipal Jail on December 7, 1988 by hanging herself with her panty hose, and it is this event which gives rise to the allegations in the complaint. Kocienski alleges that her sister's death was the direct and proximate result of defendants' wanton and callous indifference to her sister's obvious psychological needs and that, by failing to prevent her sister from committing suicide, defendants deliberately subjected her sister to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States. *See* Amended Complaint at Counts Four and Five.[1]

Defendant James Sisk ("Sisk"), Chief of Police of the Bayonne Police Department, as well as defendants Leonard Sullivan ("Sullivan"), David Markowski ("Markowski"), Mark Smith ("Smith"), Robert McCarthy ("McCarthy"), and John Klimek ("Klimek"), officers employed by the Bayonne Police Department, now move for summary judgment. *See* Fed.R.Civ.P. 56. These officers ("the Bayonne defendants") assert that their conduct toward Garity during her period of incarceration in the city jail cannot be characterized as having been deliberately indifferent to any known psychological need Garity may have had, and that, as a consequence, they are not responsible for her death.

For the reasons set forth below, summary judgment will be granted in favor of defendants Sisk, Sullivan, Markowski, Smith, McCarthy and Klimek. On the Court's own motion, the City of Bayonne and the Bayonne Police Department will be

---

1. The specific allegations in Kocienski's complaint are set forth within.

dismissed as defendants. The actions of the remaining defendants ("the Hudson County defendants") are not now before me and, therefore, will not be addressed at this time.

## II. FACTS

At sixteen minutes past midnight on the morning of December 7, 1988, two officers of the Bayonne Police Department responded to a report that a heavy set woman was breaking into automobiles parked in the area of 22 West 29th Street, in Bayonne. The officers arrived at the scene and observed Garity fleeing from the area with several bags of merchandise. Garity was detained and a brief investigation at the scene revealed that much of the merchandise had been taken from the interior of several nearby cars. This merchandise included, *inter alia*, two calculators, an American Express Card, and several cassette tapes. *See* Defendants' Movant Brief I at Exh. 1-2. Garity was also found to be carrying a Phillips Head screw-driver which the police believed had been used to gain entry to the automobiles. Garity was arrested and subsequently charged with theft and possession of burglary tools. *See* Defendants' Movant Brief I at Exhs. 6-7.

After her arrest, Garity was transported to the Bayonne Municipal Jail where she was searched by a female guard. *See* Defendants' Movant Brief I at Exh. 8. Garity was wearing trousers, a plaid shirt and panty hose. The guard removed only Garity's earrings, a gold colored chain, and her shoe laces. *Id.*

Garity was placed in a cell in the female block of the jail at 1:15 A.M. From 1:15 A.M. to 6:00 A.M., the cells were checked every fifteen minutes, and from 6:20 A.M. to 10:35 A.M., the cells were checked every twenty-four minutes. *See* Defendants' Movant Brief I at Exhs. 10, 11. Garity was served breakfast at 8:30 A.M. and, at 8:54 A.M., she was taken to a conference room for questioning.

Garity was escorted to the conference room by officer Markowski. Both Markowski and another officer, Smith, were present at the session, which lasted approx-

imately thirty to forty minutes. During the questioning, a third officer, Sullivan, entered the room and noticed that Garity was wearing panty hose. He informed Markowski and Smith that, upon returning Garity to her cell, one of them should inform the desk officer that she was wearing panty hose. *See* Defendants' Opposition Brief at Exhs. 12–15. *See also* Deposition of David H. Markowski, sworn to September 19, 1990 (hereinafter "Markowski Dep.") at pp. 55–56. *See also* Deposition of Mark Smith, sworn to September 19, 1990 (hereinafter "Smith Dep.") at pp. 109–110.

Markowski and Smith finished questioning Garity at approximately 9:30 A.M., at which time Smith escorted Garity back to the front desk. Smith placed Garity in a glass-fronted holding room near the desk and informed the desk officer, McCarthy, that Garity was wearing panty hose. *See* Smith Dep. at pp. 110–111. After being alerted to this fact, McCarthy briefly attempted to locate a female police officer to ascertain whether or not standard police procedure mandated that Garity surrender her panty hose, but was unable to locate anyone to answer his question. He subsequently became immersed in his duties at the desk and make no further inquiries. *See* Plaintiff's Opposition Brief I at Exh. J.

At 9:45 A.M., Garity was returned to her cell by the guard monitoring the cell block, Klimek. McCarthy did not inform Klimek that Garity was wearing panty hose, and Klimek was apparently unaware of that fact. *See* Markowski Dep. at p. 72; *see also* Plaintiff's Opposition Brief at Exh. J. At the time that Garity was returned to her cell, the cell block was being checked every twenty-four minutes. *See* Defendants' Movant Brief I at Exh. 11. The cells were also equipped with a continuously functioning audio surveillance system.

When Klimek checked Garity's cell at 10:35 A.M., he found her hanging by her panty hose, which she had tied to the bars of her cell. Klimek unsuccessfully attempted to resuscitate her and hit a "panic button" to summon assistance. Several police officers came to his aid, and a paramedic squad was also summoned. Garity was

taken to the Bayonne Hospital, where further attempts were made to resuscitate her. She was pronounced dead at 11:10 A.M. *See* Defendants' Movant Brief I at Exh. 16; *see also* Plaintiff's Opposition Brief I at p. 12.

Only moments after Garity was found hanging by her panty hose, Detective Hendra of the police department was summoned. *See* Plaintiff's Opposition Brief I at pp. 7–8 and Exh. L (p. 2). Hendra photographed the scene and drew a sketch of the cell depicting the location of Garity's body in relation to the other items in the cell. *See* Plaintiff's Opposition Brief I at Exh. (p. 4) (sketch) and Exh. K (color photographs). Hendra's photographs reveal, *inter alia*, that several drops of blood were in the toilet bowl, and on the surface of a bench which was situated on one side of the cell. *See* Plaintiff's Opposition Brief I at Exh. K, Photographs A, D and E.

December 7, 1988 was not the first day on which members of the Bayonne Police Department had come into contact with Garity. On January 25, 1987, Kocienski had reported Garity to the police department as a missing person. *See* Plaintiff's Opposition Brief I at Exh. E. The police report indicated that Kocienski had informed the police that Garity had a history of psychological problems, and may have been suffering from emotional problems as a result of the recent death of her husband. Kocienski canceled the missing person report two days after it was filed. *Id.*

Similarly, on June 15, 1987, the police came into contact with Garity after having been called by Kocienski to go to Garity's apartment because it appeared she had overdosed on drugs. An officer found Garity in a dazed state, and summoned an ambulance to assist her. *See* Plaintiff's Opposition Brief I at Exh. F. Kocienski alleges that she informed the police over the telephone of Garity's history of depression and suicide. *See* Affidavit of Elizabeth Kocienski, sworn to August 23, 1990 (hereinafter "Kocienski Aff.") at ¶ 3.

On November 23, 1988 (two weeks prior to the events in question) officers Smith and Markowski called on Garity while investigating a burglary and theft at the apartment next door to Garity's and noticed that she appeared to be intoxicated. *See* Defendants' Movant Brief I at Exh. 18. Garity was subsequently arrested in connection with the incident, and was thereafter incarcerated in the Hudson County Jail.

While Garity was briefly imprisoned at the Hudson County Jail, Kocienski filed an application in the Superior Court of New Jersey pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25–1 *et seq.* In her application, Kocienski requested that that court enter a temporary restraining order against her sister on the ground that—as reflected in the standard language of such orders—her sister had acted to endanger Kocienski's "life, health and well being". *See* Kocienski Aff. at Exh. C (order). Kocienski's application was granted by the Hon. Seymour Margulies, J.S.C., on November 29, 1988. The handwritten words "police assistance" and "psychiatric" appear without explanation in that section of the order marked "Other".[2]

That same afternoon, Kocienski took a copy of the order to the Bayonne Police Department so that the department would be apprised that a restraining order had been issued for her protection. *See* Kocienski Aff. at ¶¶ 5, 6. Kocienski left a copy of the order with the desk officer at the station.

The following day, Kocienski noticed on her copy of the order that her sister's last name had not been filled in at the top. *See* Kocienski Aff. at ¶ 7. When she called the police station to correct the omission, officer McCarthy answered the phone. *Id.* Kocienski asked him to add the name "Gar-

**2.** In a related portion of her complaint, Kocienski alleges, apparently based on the word "psychiatric", that authorities at the Hudson County Jail willfully and maliciously failed to follow Judge Margulies' direction that Garity be given a psychiatric evaluation, and that this failure constituted deliberate indifference to Garity's serious medical needs. *See* Amended Complaint at Counts Two and Three. As indicated, these allegations are not presently before the Court, and will not be addressed at this time.

ity" after the first two names listed at the top of the order, and he complied with her request. *Id.* The next time the Bayonne Police Department came into contact with Garity was on December 7, 1988, the date on which she committed suicide.

After Garity's suicide, her personal belongings were returned to Kocienski. *See* Kocienski Aff. at ¶ 8. Kocienski avers that after receiving Garity's purse from the officers in charge, she opened it, inspected the contents, and found two items of relevance to this proceeding, that is 1) an appointment-reminder card from the Bayonne Mental Health Center with an appointment marked "12/15" at "4" p.m.; and 2) two appointment-reminder slips from Spectrum Health Care Incorporated—a methadone treatment center—with appointments set down for 9:30 A.M. on "12–6–88" (the day before the suicide) and 10:00 A.M. on "12–14–88" (one week after the suicide). *See* Kocienski Aff. at Exh. D. The record is unclear as to whether or not the police opened the purse and catalogued its contents at the time they impounded it.

An autopsy was performed on Garity approximately four hours after her death. The report indicated, *inter alia*, that the bones of Garity's nose were intact and that the mucus membranes of her nose were dry, without any foreign matter or blood. *See* Autopsy Report at p. 1. Garity's lips, cheeks and gums were untraumatized. The interior of her mouth, however, was stained with dried blood and also contained mucus mixed with wet blood. The source of this blood is identified in the report as

having flowed from a loose incisor tooth. *Id.* at p. 2.

Garity's body also displayed a ligature mark around her head as well as several minor scratch-like scars on her hands. These scratches were estimated to be twenty-four hours old. *Id.* In addition, Garity had several small bruises on top of her head, well within her hairline, as well as a small bruise just below the lobe of her right ear, just above the ligature mark. *Id.*

■ Kocienski filed her complaint on May 14, 1990, naming all defendants except McCarthy and Klimek. An amended complaint was filed on August 27, 1990 naming those individuals as well. The amended complaint sets forth eight counts. Count One seeks injunctive relief permanently closing the Bayonne municipal jail. Counts Two and Three pertain to the Hudson County defendants and are not of immediate relevance here. Count Four seeks compensatory and other damages against the Bayonne defendants for violation of Garity's rights under the Constitution of the United States.[3] Count Four also seeks damages for violation of the Constitution of the State of New Jersey,[4] as well as violation of "42 U.S.C.Sec. 1983".[5] Count Five reiterates the claims set forth against the Bayonne defendants, but invokes the provisions of the Fourteenth Amendment of the Constitution of the United States. Count Six seeks damages against the City of Bayonne for failing to adequately train its officers in the area of suicide prevention. Count Seven appears to reiterate claims set forth in the previous counts of

---

**3.** Count Four does not specify any portion of the Constitution, but speaks only generally of the "rights under ... [the] United States Constitution. *See* Amended Complaint at ¶ 65. Counsel for plaintiff has indicated, however, that Count Four was intended to invoke the provisions of the Eighth Amendment. *See* Plaintiff's Opposition Brief I at p. 2.

**4.** Counsel for plaintiff has not identified any specific portion of the New Jersey constitution which has been violated, but it may be surmised from counsel's remarks made with respect to the federal constitutional claims alleged, *see supra* note 3, that he intended to invoke Art. I, ¶ 12 of the New Jersey constitution. ("Excessive

bail shall not be required ... and cruel and unusual punishments shall not be inflicted.")

**5.** To the extent that counsel for plaintiff has attempted to state a separate cause of action pursuant to 42 U.S.C. § 1983, it is pertinent to note that Section 1983 does not create substantive rights, but only provides a remedy for a deprivation of rights established elsewhere. *See Wilson v. Garcia*, 471 U.S. 261, 278, 105 S.Ct. 1938, 1948, 85 L.Ed.2d 254 (1985). This portion of Count Four (as well as other portions of the complaint setting forth a similar claim) thus fails to set forth any additional violation of federal law.

the complaint.[6] Finally, Count Eight contains a separate request for damages resulting from Garity's pain and suffering.

## III. DISCUSSION

As indicated, Kocienski purports to bring her federal claims against the individual officers pursuant to 42 U.S.C. § 1983. In order to sustain a cause of action under Section 1983, Kocienski must show that Garity was deprived of a federal right secured by the Constitution or laws of the United States by a person acting under color of state law.[7] *See Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981). There is no question that the officers involved were acting under color of state law, and the only issue is whether or not Garity was subjected to a deprivation of her federal rights as secured by the Constitution.

■ At the time of the events in question, Garity was a pre-trial detainee, and not a convicted prisoner. Accordingly, the claims surrounding her treatment arise not under the Eighth Amendment[8], whose strictures apply only after the state has secured the right to punish after a formal adjudication of guilt in accordance with due process of law, *see City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983), but rather under the due process clause of the Fourteenth Amendment[9], which prohibits punishment of a detainee prior to an adjudication of guilt. *See Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1871–72, 60 L.Ed.2d 447 (1979). In any event, both provisions are governed by the now familiar "deliberate indifference" standard developed in accordance with the Eighth Amendment and as set forth in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Accordingly, I shall apply that standard here. *See Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 762 (3rd Cir.1979).

■ It has long been settled that once the state has deprived a person of his or her liberty and, concomitantly, the ability to seek out medical treatment, the state may not ignore any serious medical needs that that individual may evidence and could have corrected but for the detention. Where such wilful ignorance or reckless disregard of medical needs takes place, it is tantamount to punishment in contravention of the due process clause. *See, e.g., Inmates of Allegheny County,* 612 F.2d at 762.

In this regard, it is also clear that the psychological needs of a detainee may be

---

**6.** As indicated, Count Seven appears to simply reiterate most the claims set forth in the previous portions of the complaint. In addition, however, I note that Count Seven seems to suggest that certain of the defendants tried in some manner to cause Garity to become insane, although nowhere are the person or persons involved, or the method, identified. In this regard it is clear that this portion of the complaint is so vaguely worded as to fail to provide even a "modicum of factual specificity, identifying the particular conduct of defendants that is alleged to have harmed the plaintiff[ ]", *see Ross v. Meagan,* 638 F.2d 646, 650 (3rd Cir.1981). As such, it would be subject to immediate dismissal for failure to state a claim upon which relief may be granted. *See* Fed.R.Civ.P. 12(b)(6). This largely cryptic suggestion, which is nowhere borne out in the record, will, accordingly, be disregarded and the Court will treat all of Count Seven as simply restating the substance of the previous allegations of the complaint.

**7.** Title 42, Section 1983 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

**8.** The Eighth Amendment to the Constitution of the United States provides:

Excessive bail shall not be required, nor excessive fined imposed, nor cruel and unusual punishments inflicted.

*See* U.S. Const., Amend. 8.

**9.** The Fourteenth Amendment to the Constitution of the United States provides, in pertinent part:

[No state shall] deprive any person of life, liberty, or property, without due process of law . . .

*See* U.S. Const., Amend. 14, § 1.

as serious as any physical ailment, and that the failure to properly address such needs may have serious repercussions, particularly when those needs create suicidal tendencies in the detainee. *See Partridge v. Two Unknown Police Officers of Houston*, 791 F.2d 1182, 1187 (5th Cir.1986). As Judge Wisdom succinctly stated for the Court of Appeals for the Fifth Circuit in *Partridge*, *supra:*

> [J]ust as a failure to act to save a detainee from suffering from gangrene might violate the duty to provide reasonable medical care ... failure to take any steps to save a suicidal detainee from injuring himself may also constitute a due process violation ...

*See Partridge*, 791 F.2d at 1187.

■ In applying these principles to the present case, it must be remembered, however, that the due process clause acts to proscribe the conscious or reckless disregard of known medical problems, and not the happenstance deprivation of medical care which arises through mere negligence. *See Estelle v. Gamble*, 429 U.S. at 105–106, 97 S.Ct. at 291–92; *see also Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). The Constitution was designed to protect citizens from abusive tactics, not merely the inevitable errors and foibles of human conduct. As the Supreme Court of the United States has noted in a similar context:

> Respondents' lack of due care in this case led to serious injury, but that lack of care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent. *Daniels* [*v. Williams*, 474 U.S. 327, 331–333, 106 S.Ct. 662, 664–666, 88 L.Ed.2d 662 (1986) ]. Far from abusing governmental power, or employing it as an instrument of oppression, [the prison official] mistakenly believed that the situation was not particularly serious, and [another prison official] simply forgot about the note. *The guarantee of due process has never been understood to mean that the State must guarantee due care on the part of its officials.* *See Davidson v. Cannon*, 474 U.S. 344, 347–348, 106 S.Ct. 668, 670–671, 88 L.Ed.2d 677 (1986) (emphasis added).[10]

In order to sustain a claim under the due process clause, Kocienski must, therefore, show that the officers in question acted with deliberate or wanton indifference to Garity's serious psychological needs, needs of which they were aware or should have been aware at the time of her incarceration. Absent such deliberate indifference, there can have been no deprivation of her due process rights and, concomitantly, no basis for maintaining an action pursuant to Section 1983. *See Williams v. Borough of West Chester*, 891 F.2d 458, 464–467 (3rd Cir.1989); *Freedman v. City of Allentown*, 853 F.2d 1111, 1114–1117 (3rd Cir.1988); *Colburn v. Upper Darby Tp.*, 838 F.2d 663, 668–670 (3rd Cir.1988); *Snyder v. Baumecker*, 708 F.Supp. 1451, 1460–1461 (D.N.J.1989) (jail suicide cases).

While the courts have not been entirely specific in defining the precise meaning of "deliberate indifference", this term—as may be surmised from the foregoing—has been described by the Court of Appeals for the Third Circuit as collectively encompassing that manner of conduct or state of mind which displays a recklessly indifferent or grossly negligent attitude. *See Williams*, 891 F.2d at 464, n. 10; *Colburn*, 838 F.2d at 670. This definition, of course, stands in sharp contrast to that ordinarily provided for "negligence"—for which, as indicated, liability will *not* lie—that is, the doing of that which a reasonable person would not do under the circumstances, or, by contrast, the failure to do that which a reasonable person would do under the circumstances. *See generally*, Black's Law Dictionary 930 (1979).

In applying these principles to the facts of the present case, it is clear that Kocienski and Garity's estate cannot prevail against any of the officers in question for failing to prevent Garity's suicide. Sum-

---

**10.** The language of *Davidson* set forth above is also noted in *Freedman v. City of Allentown*, 853 F.2d 1111, 1117 (3rd Cir.1988).

mary judgment will therefore be granted in favor of defendants.

■ As to officer Klimek, the guard on duty in the cell block from 6:20 A.M. to 10:35 A.M., it utterly unreasonable to suggest, as plaintiff suggests, that his actions in checking the cells at twenty-four minute intervals to ensure Garity's safety and well-being constituted deliberate indifference, even assuming he was fully aware of Garity's suicidal tendencies. Summary judgment will, therefore, be granted in his favor. *See, e.g., Snyder,* 708 F.Supp. at 1461 (no deliberate indifference where plaintiff with known suicidal tendencies is placed on thirty minute suicide watch).

■ As to officer McCarthy, Kocienski argues that he should have been aware of Garity's suicidal tendencies and that his failure to take action to prevent the suicide or, presumably, to alert others to the possibility of that occurrence, constitutes deliberate indifference. *See, e.g.,* Amended Complaint at ¶ 61. More particularly, Kocienski asserts that McCarthy should have been alerted to the possibility of Garity's suicide when Kocienski drew his attention to the existence of the temporary restraining order when she telephoned police headquarters on November 30, 1988 to correct her sister's name on the face of the order. *See* Kocienski Aff. at ¶ 7. Kocienski alleges, in essence, that what she perceives from the mere use of the word "psychiatric" to be the order's requirement that Garity undergo a psychiatric examination should have been sufficient to alert McCarthy of her sister's suicidal tendencies.

I cannot agree. McCarthy's failure to discern Garity's suicidal tendencies from the face of the order at most bespeaks negligence. Indeed, it has been held that the failure to recognize signs far more indicative of potential suicide than that which McCarthy "failed" to recognize has constituted negligence only. In *Freedman v. City of Allentown, supra,* for example, the Court of Appeals for the Third Circuit held that the failure of several police officers to recognize "large" and "prominent"

scars on the wrists, elbows and neck of a detainee as "suicide hesitation cuts"—which scars, in fact, the detainee had himself pointed out to the officers—constituted only negligence. *See Freedman,* 853 F.2d at 1116. ("[T]he failure to recognize [the scars] as [suicide hesitation cuts], without more, amounts only to negligence and therefore fails to support a claim under section 1983"). Here, the case is much weaker. The word "psychiatric" on the face of the order, which was anything but "prominently" displayed, is neither suggestive of nor synonymous with the term "suicidal". In short, the existence and contents of the order could not have put McCarthy on notice of Garity's suicidal tendencies.[11]

Even assuming that McCarthy did have knowledge of Garity's suicidal tendencies—an assumption with little if anything to support it—his failure to communicate such knowledge to the other officers in the station would also constitute negligence only, that is, the failure to do that which a reasonable person would do under similar circumstances. Once again, a similar conclusion was reached in *Freedman,* where it was held that the failure of the detainee's probation officer to communicate the detainee's known suicidal tendencies to custodial officials after being informed that the detainee had been incarcerated constituted negligence only. *See Freedman,* 853 F.2d at 1117. ("It may be that a reasonably prudent probation officer, knowing that [the detainee] was being questioned or had been detained, would have cautioned the detaining officers about [the detainee's] prior suicide attempt and suicidal tendencies.... Because we fail to find any factual allegation that would support the conclusion that [the probation officer's] conduct was more than mere negligence, we will ... affirm the district court's dismissal of the complaint as to him").

■ As to Sullivan, Markowski and Smith, Kocienski asserts that the failure to assure that Garity's panty hose were re-

---

11. The same would also be true regarding the appointment cards in Garity's purse, *see supra,* even assuming that McCarthy or any other officer saw them.

moved after becoming aware that she was wearing panty hose constitutes deliberate indifference to Garity's psychological needs. *See* Plaintiff's Opposition Brief II at p. 10, ¶ 3b. There is nothing in the record, however, to indicate that any of these officers had knowledge of Garity's suicidal tendencies. Accordingly, their failure to have her panty hose removed—even if violative of police procedures (a matter about which the record is not entirely clear) —would not constitute deliberate indifference. The police simply cannot be charged with being deliberately indifferent to a condition about which they have no actual or constructive knowledge. In *Williams v. Borough of West Chester, supra,* for example, the Third Circuit upheld the dismissal of a complaint against officers who failed to remove a suicide victim's belt (in contravention of standard police procedures), where there was no evidence in the record to indicate that any of the officers had knowledge of the victim's suicidal tendencies. *See Williams,* 891 F.2d at 465–466.

Perhaps more significantly, in *Williams,* the court drew this conclusion notwithstanding the presence of certain background evidence tending to show—as is the case here—that the police department in general had some colorable background knowledge concerning the victim's earlier, somewhat bizarre, behavior. In *Williams,* this evidence was, in the final analysis, deemed to be simply too tenuous for a reasonable jury to conclude that any of the specific officers in question possessed sufficient knowledge of the victim's suicidal tendencies. Absent such specific knowledge, the failure to remove the victim's belt constituted negligence only.

The same is true here. The incident of December 7, 1987 (an event occurring almost two years prior to the Garity's suicide), and the incident of June 15, 1987 (an event occurring a year and a half prior to Garity's suicide), were simply too remote in time and too far divorced from the custodial officials in charge to attribute actual or constructive knowledge of Garity's psychological tendencies. Without proof of specific knowledge on the part of the custodial officials in charge, no liability will lie.

Also significantly, in *Williams,* the Third Circuit felt compelled to reach its conclusion as to the individual officers where—as is the case here—the officers in charge had submitted affidavits in which they swore that they had no actual knowledge of the victim's particular psychological problems. *See Williams,* 891 F.2d at 466; *see also, e.g.,* Certification of David Markowski, sworn to August 7, 1990, thereinafter "Markowski Cert.") at ¶ 2; Certification of Mark Smith, dated August 7, 1990 (hereinafter "Smith Cert.") at ¶ 2; Certification of Leonard Sullivan, sworn to August 7, 1990, thereinafter "Sullivan Cert.") at ¶ 2. Absent evidence to the contrary and, hence, the existence of a disputed material fact, summary judgment was deemed appropriate. *See Williams,* 891 F.2d at 460, 466.

Moreover, while Kocienski has pointed out that Smith and Markowski participated in the earlier investigation of Garity on November 23, 1988, at which time they observed Garity to be in an intoxicated state, *see supra,* there is nothing in the record to suggest that they should have assumed that Garity had suicidal tendencies at the time they arrested her two weeks later.

Finally, as to Sisk, there is nothing in the record which indicates that he was personally involved or acquiesced in anything to do with Garity during her period of incarceration. Accordingly, he cannot be held liable. *See, e.g. Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3rd Cir.1988).

As the foregoing indicates, it is clear that summary judgment in favor of Sisk, Sullivan, Markowski, Smith, McCarthy and Klimek is warranted. In reaching the foregoing conclusion, I reject Kocienski's argument that summary judgment would be inappropriate until such time as there has been more discovery concerning the blood found within Garity's cell. There is simply nothing more to uncover regarding the source of the small amounts of blood found in the toilet and in the other areas of the cell. A full autopsy has been conducted and unequivocally revealed that the only source of blood was from nothing more

sinister than a loose tooth. Moreover, and most critically in light of the freewheeling and somewhat hysterical suggestion by Kocienski that the police may have used "severe" force in striking Garity in the jaw, *see, e.g.*, Plaintiff's Opposition Brief I at p. 21, the autopsy unequivocally determined that there were absolutely no signs that Garity's lips, cheeks, or gums had recently been traumatized. *See* Autopsy Report at pp. 1–2. Stated somewhat differently, there is no evidence from which any reasonable juror could draw an inference that Garity had received a traumatic blow to the jaw moments before she hung herself. Neither the repeated use of overly-dramatic language in Kocienski's brief to the Court, nor her selective use of the facts found by the medical examiner, are enough to alter this result, and summary judgment is appropriate.[12]

## IV. CONCLUSION

For the reasons set forth above, summary judgment will be granted in favor of defendants Sisk, Sullivan, Markowski, Smith, McCarthy and Klimek, dismissing the federal claims arising under the Eighth and Fourteenth Amendments as set forth in Counts Four, Five and Seven. To the extent that pendent claims have been set forth against these defendants in these counts, they will be dismissed as well. *See Lovell Mfg. v. Export–Import Bank of the U.S.*, 843 F.2d 725, 735 (3rd Cir.1988) ("Absent 'extraordinary circumstances' a district court in this circuit is powerless to hear claims lacking an independent jurisdictional basis....") (*quoting Weaver v. Marine Bank*, 683 F.2d 744, 746 (3rd Cir. 1982).

There are no allegations against the Bayonne Police Department as an entity and, on the Court's own motion, that defendant will be dismissed from this action. Moreover, inasmuch as I have determined that summary judgment is appropriate on behalf of the individual officers, I will also dismiss Count Six, in which the City of Bayonne ("the City") is separately charged with failing to train its police officers. Although the City has not formally moved for summary judgment, dismissal is clearly in order in view of my finding that Garity suffered no constitutional deprivation at the hands of the individual officers. As the Supreme Court of the United States stated in *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986): "If a person has suffered no constitutional injury at the hands of the individual police officer[s], the fact that the departmental regulations might have *authorized* the use of [unconstitutional action] is quite beside the point". *See Heller*, 475 U.S. at 799, 106 S.Ct. at 1573 (*per curiam*) (emphasis in original). *See also Williams*, 891 F.2d at 467 (noting *Heller* and declining to address claims against municipality alleging failure to train after affirming dismissal as to individual officers). This is clearly an appropriate procedure for, as I have had occasion to remark elsewhere, a contrary result would permit plaintiffs to "roam freely as knights *errant amici*" searching for deficiencies in training programs where no harm has been caused to them by those programs. *See Rodriguez v. City of Passaic*, 730 F.Supp. 1314, 1321 (D.N.J.1990), *aff'd*, 914 F.2d 244 (3rd Cir. 1990). Thus, as indicated, Count Six will also be dismissed.[13] Finally, in the absence

---

**12.** The same is also true regarding Kocienski's exaggerated claims concerning the minor bruises which Garity had on top of her head. *See* Plaintiff's Opposition Brief I at p. 21.

**13.** In dismissing Count Six, I note in passing, that even were I incorrect in my belief that none of the officers in question deprived Garity of any of her rights under the Constitution, thus making dismissal of the City premature under *Heller*, there is nevertheless no indication in the record that the City acted with deliberate indifference to the consequences of any policy that could be said to have caused Garity harm. *See*

generally *City of Canton v. Harris*, 489 U.S. 378, 390–391, 109 S.Ct. 1197, 1205–1206, 103 L.Ed.2d 412 (1989). *See also Williams*, 891 F.2d at 467, n. 14. (declining to address claims against municipality but noting in the alternative that no failure to train claim existed). While Kocienski has pointed to a handful of suicides which have taken place in the City jail over a period of years, *see* Plaintiff's Opposition Brief I at pp. 3–4, as well as the purported "failure" of the jail to follow state recommendations regarding the installation of video monitoring equipment, *see* Plaintiff's Opposition Brief I at pp. 12–13, none of these claims appears persuasive on the

of a review of the City's training program, the prospective injunctive relief requested in Count One falls of its own weight. Accordingly, the Court will dismiss this count as well.[14]

An appropriate order shall issue.

ORDER

This matter having been opened to the Court upon the motion of defendants James Sisk, Leonard Sullivan, David Markowski, Mark Smith, Robert McCarthy, and John Klimek for summary judgment pursuant to Federal Rule of Civil Procedure 56 dismissing the federal claims set forth in Counts Four, Five and Seven of the Amended Complaint; and the Court having considered the submissions of the parties both in support of and in opposition to the above motion without oral argument, pursuant to Federal Rule of Civil Procedure 78;

IT IS on this 22nd day of February, 1991, for the reasons set forth in this Court's opinion of even date hereby

ORDERED, that the motion of defendants James Sisk, Leonard Sullivan, David Markowski, Mark Smith, Robert McCarthy and John Klimek for summary judgment dismissing the federal claims set forth in the aforementioned counts of the Amended Complaint of plaintiff Elizabeth Kocienski is granted; and it is further

ORDERED, that the state claims set forth in the aforementioned counts of the Amended Complaint as to the moving defendants are hereby dismissed; and it is further

ORDERED, that, on the Court's own motion, Counts One and Six of the Amended Complaint are dismissed.

record. *See, e.g. Freedman,* 853 F.2d at 1116 (dismissing visual surveillance claim on failure to train claim). *See also Williams v. City of Lancaster,* 639 F.Supp. 377, 384 (E.D.Pa.1986) (video surveillance).

14. As to Count One, I note that, in any event, Kocienski would appear to lack standing to present this claim. Accordingly, although it is a matter upon which I express no formal opinion, dismissal would appear to be appropriate on this ground as well. *See Snyder v. Baumecker,* 708 F.Supp. 1451, 1458 (D.N.J.1989).