Elise Elizabeth GORDON, individually and as Administratrix of the Estate of Clarence Gordon, Deceased, Plaintiff–Appellee,

v.

C.W. KIDD, Julius Lloyd, Elaine Gravitt, Todd Lockamy, R.E. Ramsey, Deputy Sheriff, John W. Smith, Deputy Sheriff, City of Charlotte, B.G. Simmons, Officer, R.S. Barker, Officer, C.G. Lyman, Officer, Defendants–Appellants.

and

Roy Rivers, Sergeant, Benjamin Cooper, Robert Bynum, Defendants.

No. 91–2514.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1991.

Decided July 1, 1992.

As Amended July 7, 1992.

---

trict court's denial of summary judgment as a "final order" within the meaning of 28 U.S.C. § 1291. *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). We affirm the district court's denial of summary judgment to John W. Smith and remand the complaint against him for trial. However, because Mrs. Gordon's evidence does not create triable issues of fact with respect to the other defendants, we reverse the judgment as it pertains to them and remand for the entry of summary judgment in their favor. Mrs. Gordon voluntarily dismissed defendants Roy Rivers, Benjamin Cooper, and Robert Bynum.

Lawrence P. Egerton, Womble, Carlyle, Sandridge & Rice, Winston–Salem, N.C., Frank B. Aycock, III, Charlotte, N.C., argued (Tyrus V. Dahl, Jr., Womble, Carlyle, Sandridge & Rice, Winston–Salem, N.C., James O. Cobb, Ruff, Bond, Cobb, Wade & McNair, Kenneth H. Boyer, Jones, Hewson & Woolard, Charlotte, N.C., Louis L. Lesesne, Jr., Lesesne & Connette, Charlotte, N.C., on brief), for defendants-appellants.

William D. McNaull, Jr., Charlotte, N.C., argued (Patricia E. King, on brief), for plaintiff-appellee.

Before SPROUSE and LUTTIG, Circuit Judges, and BUTZNER, Senior Circuit Judge.

## OPINION

BUTZNER, Senior Circuit Judge:

This appeal concerns the suicide of Clarence Gordon while he was detained in the Mecklenburg County jail. Appellants, defendants below, are the city of Charlotte, employees of the city, and employees of Mecklenburg County. The appellants assign error to the denial of their motion for summary judgment in an action under 42 U.S.C. § 1983 brought by Elise Elizabeth Gordon, individually and as administratrix of the estate of Clarence Gordon deceased. Because the appellants raised the defense of qualified immunity, we review the dis-

I

Shortly after 4 a.m. on June 17, 1988, two Mecklenburg County officers found Clarence Gordon, a pretrial detainee who had been arrested the previous night, hanging by his sweater from the top bars of a holding cell on the first floor of the county jail. Gordon, a 39 year-old forklift operator with a history of alcohol abuse, mental illness, and depression, had committed suicide.

Late the evening before, Gordon's wife looked into the kitchen from the living room of their house and saw her husband standing with a four-inch steak knife pressed against his chest near his heart. Mrs. Gordon later said that the expression on his face convinced her that he wanted to stab himself with the knife and kill himself. After asking him to stop, Mrs. Gordon called the 911 emergency numbers and told the dispatcher that "[m]y husband needs help." Emergency service records show that her call was logged at 10:22 p.m. The dispatcher asked whether Gordon needed "a police officer or a medic." Mrs. Gordon responded, "I don't know. He was standing there trying, like he was gonna stab himself, he's been drinking a lot." In response to a question, she added that her husband was "[t]hreatening to kill himself with a knife stuck to his chest, but he put it down, but see I'm not going through this the rest of the night." She also told the

dispatcher that Gordon was "sloppy drunk."

The dispatcher then issued a call on the Charlotte Police Department radio frequency. Having contacted a nearby unit, the dispatcher issued a code meaning "domestic disturbance" and said, "See Alice Gordon reference to her husband is there threatening to kill himself with a knife." Officer B.G. Simmons responded to the call and arrived at the Gordon residence between 10:25 and 10:30 p.m. At the door to the house, Simmons met Mrs. Gordon, who "said that her husband was inside, that he was drunk, that he was looking for a knife to kill himself with." Officer Simmons entered the house and saw Gordon, who was walking from the living room into the kitchen. Simmons observed that Gordon appeared intoxicated. Simmons attempted to question Gordon, but Gordon did not reply. Using a hand-held radio, Simmons then requested the dispatcher to "step the backup up." Simmons told the dispatcher that the subject was "10–73," a code meaning "mental subject."

Simmons asked Mrs. Gordon whether she planned to have her husband involuntarily committed to a mental hospital. She responded "that he was on the wine and that when he was drinking he was violent and he was, her words, is that she was, he was threatening to kill himself." Mrs. Gordon asked whether Simmons could take her husband to a detoxification center, but Simmons replied that this was not possible because "it was not against the law to be drunk in your own home." Simmons later noted that detox centers will not accept patients who are violent. Simmons told her that "if she wanted to have him committed, she could go down to the magistrate and take out the papers." Simmons then tried to leave the house, but she "insisted that I stay." A few minutes later, Officer Robert S. Barker arrived. He found Gordon still in the kitchen and Officer Simmons in conversation with Mrs. Gordon. A few seconds after Barker's arrival, Gordon got a steak knife from a kitchen drawer. Holding it in front of him, he advanced slowly toward the two police officers. They drew their guns and ordered

him to drop the knife. Simmons told him "I'd kill him if he took another step, and he stopped." Gordon put the knife on the floor. At the officers' orders, he began to lie on the floor but then grabbed the knife again and attempted to run away through the kitchen door. He slipped in the kitchen, fell to the floor, and lost the knife. The officers seized him, placed him in handcuffs, and arrested him on a charge of assaulting an officer.

After his arrest, the officers later stated, Gordon calmed down but still seemed confused. The officers asked Mrs. Gordon whether she would seek to have her husband committed. She replied that she would telephone his mother before deciding what to do about commitment.

The officers left at about 10:42 p.m. Mrs. Gordon called Gordon's mother long distance to seek her advice about how to handle the situation. The two spoke for about 96 minutes. During the first few minutes of the conversation, Officer Barker returned to retrieve the knife Gordon had been holding when he allegedly assaulted the officers. Mrs. Gordon recalled asking whether her husband could be put in a safe place to sleep off the alcohol, and she stated that Barker agreed that "we could do that." Several times during her conversation with her mother-in-law, Mrs. Gordon heard the beep tone indicating an incoming call on her call waiting service. Concluding that the caller was probably her husband, she ignored the signal. At about 12:40 a.m., shortly before finishing her conversation, she again heard a beep and spoke with her husband, who asked her to come get him out of jail. She told him she would not. She said she intended to tell him to sleep off the alcohol and that she would come get him the next morning to seek help for his drinking. But "before I could get into detail as to why ... somebody took the phone from him and ... told me that he'll call me back in a few minutes." After this, Mrs. Gordon hung up and waited by the phone until approximately 1 a.m. At that time, she took her phone off the hook, meaning that a caller would encounter a busy signal, and went down

the street to talk to a neighbor who had been drinking with her husband earlier in the evening. She spent two and a half hours speaking with this neighbor and his wife, then returned home and replaced the receiver on the cradle. She never heard from her husband again.

After arresting Gordon, Simmons placed him in his car and took him to the Mecklenburg County Jail. Simmons later said that he decided not to seek commitment of Gordon on his own authority because

> my impression, in my dealings with Mr. Gordon, did not give me any indication that he was a mental patient or suicidal. Mr. Gordon stood there with a knife in his hand and made no attempt to injure himself. He came at me with the knife. When I told Mr. Gordon that I would kill him if he took another step, Mr. Gordon stopped. When he was told to put the knife down, he put the knife down. That does not indicate to me a person who was suicidal. In other words, I had no reason to believe that Mr. Gordon was suicidal.

J.A. 296–97. He discounted Mrs. Gordon's statements that Gordon was suicidal because "Mrs. Gordon was not willing to go down and have Mr. Gordon committed."

Arriving at the county jail at about 10:49 p.m., Simmons placed Gordon in a holding cell in the booking area. When Barker arrived, the two officers met Officer Gordon Lyman. At their request, Lyman agreed to fill out a police report on their arrest of Gordon. Officers Simmons and Barker did not wish to fill out the report themselves because Officer Simmons' duty shift ended at 11 p.m. and because officers customarily do not fill out the arrest form when they themselves are to be listed as victims of an alleged assault. After conversation with the two arresting officers, Lyman filled out an "Offense Report" describing the incident and stating, "The suspect's wife said the suspect was going to kill himself." Officer Barker, meanwhile, filled out a "Supplement Report" that narrated Gordon's behavior toward the officers but omitted any mention of his potentially suicidal behavior.

Lyman then took the police report on Gordon's arrest and agreed to complete the booking process so that Barker and Simmons could leave, because their scheduled shifts were at an end. Before they left, Lyman said, one of the officers told him "that Mrs. Gordon said something about him wanting to kill himself, and that she had been given the commitment procedures, and did not seem interested in pursuing it at that time. She just wanted to get him out of the house somewhere where he could sober up." However, Lyman also recalled that the officers told him "they did not feel that there was a legitimate concern; that they didn't see any self-destructive behavior. They saw combativeness toward them, intoxication, but nothing specifically self-destructive." Lyman further noted that Gordon seemed combative and intoxicated and that he was talking loudly. Barker and Lyman removed Gordon from the holding cell and had him fingerprinted. Lyman then told Barker and Simmons to leave. After a short wait, Lyman took Gordon before a magistrate in the jail building. He requested Gordon to be calm in the magistrate's presence and to remove his hat. Gordon "indicated that he was going to be calm."

Lyman told the magistrate the circumstances of the arrest, including that something had been said to the effect that Gordon had threatened to commit suicide and that Barker and Simmons did not feel that "it was a legitimate concern." According to Lyman, the magistrate asked Gordon "what was wrong with him," to which "[h]e replied that he had a nervous condition but he was all right." However, Gordon continued to interrupt Lyman's testimony. The magistrate then asked Lyman to escort Gordon out of the courtroom. Lyman took Gordon into an open room with a bench and left him there. After he had departed, Lyman completed his testimony. The magistrate instructed Lyman to type up a Warrant and Release Order and then to escort Gordon back into the courtroom. When Lyman returned to the open room, he found Gordon on the telephone asking the party at the other end, whom Lyman took to be Gordon's wife, to come and get him

out of jail. Lyman ordered him off the phone, saying he could call his wife later, and returned him to the magistrate's courtroom, where the magistrate told him the charges and the conditions of release available to him. Gordon asked to be taken to pretrial release. After they left the magistrate's courtroom, Gordon asked Lyman "if I really thought he was trying to hurt the officers, or something to that effect. And said that he had kids he had to get back home to take care of." Lyman took Gordon into the deputies' area of the jail.

Lyman passed Gordon into the custody of Smith, assistant supervisor of the jail. Lyman gave Gordon's belt to Smith. He said later that he then told Smith "there was a rumor that [Gordon] wanted to kill himself." In a written statement prepared for the Sheriff's Department, Smith said that Lyman gave him the belt and the arrest sheet and said "that I better watch this fellow." However, in response to an interrogatory from Mrs. Gordon's counsel, Smith reported that Lyman said, "He may try to hang himself. Here is his belt." Smith said that he ignored this warning because "Gordon showed no sign of suicidal tendencies." In later depositions, Smith claimed at first that Lyman simply said "You'd better watch this fellow" and made no reference to a potential for suicide. He stated that he believed this remark meant that Gordon was combative toward officers but not suicidal. Smith insisted that, had he heard any statement about suicide, he would have called the jail nurse to screen Gordon, as jail policy required. However, later in the same deposition, Smith was confronted with his answer to plaintiff's interrogatories. He then admitted that Lyman had not only said, "You'd better watch this fellow," but that he also said, "He may try to hang himself. Here is his belt." Smith then insisted, however, that he "interpreted it as it wasn't a serious statement." He made no further inquiry of Lyman about the meaning of his statement because "Mr. Gordon, at this time, showed of no problems" and because Lyman "was leaving the jail." Smith said that Lyman spent no more than 15 seconds in conversation with him before leaving. Smith said

that Lyman did not repeat to him what Mrs. Gordon had reported to Officer Simmons and the 911 dispatcher.

Once Lyman left the jail, Smith did not repeat his warning to anyone until after Gordon's death. This failure to transmit information about a potential suicide violated jail policy. While in Smith's custody, Gordon attempted to call his wife on the office telephone. But when Smith explained to Gordon that he might be released if he cooperated with a pretrial release interview, Gordon replaced the phone and accompanied Smith to the Pretrial Release waiting room, a holding facility where other prisoners were also being kept before their interviews. Smith said that Gordon gave him no problem; he "may have been drinking somewhat, but I didn't never see him stagger or anything." Smith did not see Gordon again.

Gordon finished his interview with Pretrial Release at about 2:30 a.m. He was moved from the waiting room back to the booking area, where he came under the supervision of Deputy Sheriff Todd A. Lockamy. At Gordon's request, Lockamy permitted him to use the booking room telephone while Security Officer Howard L. Cuthbertson began filling out forms necessary for Gordon's admission to the regular jail population. After Gordon finished using the phone, Lockamy began asking him routine medical screening questions. He noted that Gordon seemed upset and made a notation that his behavior was violent. When Lockamy asked Gordon whether he had any medical problems, Gordon replied that he had suffered two heart attacks and that he was taking Triavil. As a result of these answers, Lockamy, following jail policy, summoned the night nurse, Elaine Gravitt.

Gravitt found Gordon in the booking room standing by a pay phone. She got a jail medical screening form and conducted a very brief interview with Gordon. Gordon told her that he had once had a heart attack. Gravitt asked him whether he was currently taking medication. He replied, "I take Triavil. Call Mental Health." Triavil is an antipsychotic and antidepressant med-

ication. When Gravitt asked him for the name of his physician, she said, Gordon became agitated and belligerent, and began shouting "[C]all Mental Health. Just call Mental Health. Mental Health knows me."

Because of Gordon's hostile behavior, Gravitt was not able to perform a full physical screening. She performed no psychological screening. None of the deputies present gave Gravitt any background information on Gordon's arrest and suicidal behavior. As a result of her brief observation of Gordon, Nurse Gravitt and the deputies "decided to leave him on the first floor for the time being."

When Lockamy asked Gordon to remove his shoes before being taken to the cell, Gordon fell to the floor, jerked off his shoes, and threw them angrily away from him. After Gordon donned prison boots, Lockamy allowed him to attempt to use the phone again. However, after attempting to call, Gordon slammed the receiver back into the cradle and said, "Damn, it's still busy." At this point, Lockamy instructed Gordon to follow him to a one-person holding cell. Lockamy later reported that he decided to put Gordon in a cell by himself because of his violent behavior in the booking area. Before entering the holding cell, Gordon said, "Someone is going to pay for this." After placing Gordon in the cell, Lockamy remarked to a fellow deputy that Gordon "may have a slight mental problem." However, he said he gave no conscious thought to the possibility that Gordon might be suicidal. He did not relay his impression about Gordon's mental condition to Nurse Gravitt, though jail procedure called for him to do so.

Gravitt watched on a television monitor as Gordon was put into a holding cell by himself. She then returned to her office and called Mecklenburg County Mental Health Services, which returned her call some time after 3 a.m. The duty nurse told Gravitt that Gordon had been treated there for depression the previous year and had been diagnosed as schizophrenic. The duty nurse added that Gordon's case had been closed in 1987. Records of the Mental Health Services show that Gordon had

been diagnosed as suffering from "dysthymic disorder" and was considered an "episodic alcoholic." Clinicians there had rated his "danger to self" as "none." In her deposition, Gravitt did not report being apprised of Mental Health's observation that Gordon was not suicidal.

Notations in jail records state that Deputy Reginald E. Ramsey checked on Gordon in the holding cell at 3:45 a.m. Shortly after 4 a.m., Security Officer Cuthbertson and Security Officer Robert L. Bynum checked the cell again and found Gordon dead. Attempts to resuscitate him failed.

## II

■ In analyzing the appeal of a denial of summary judgment on qualified immunity grounds, it is

> necessary first to identify the specific constitutional right allegedly violate, then to inquire whether at the time of the alleged violation it was clearly established, then further to inquire whether a reasonable person in the official's position would have known that his conduct would violated that right.

*Collinson v. Gott,* 895 F.2d 994, 998 (4th Cir.1990) (Phillips, J., concurring). With those principles in mind, we review the district court's refusal to grant summary judgment to appellants, applying the established standard for review of summary judgment motions. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." Fed.R.Civ.P. 56(c). It is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), nor is it appropriate "even where there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn therefrom." *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979) (citation omitted). Where the party opposing summary judgment would

have the burden of proof at trial, that party is entitled

> to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered.

*Charbonnages,* 597 F.2d at 414. Where states of mind are decisive as elements of a claim or defense, summary judgment ordinarily will not lie. *Charbonnages,* 597 F.2d at 414.

### III

The first issue for this court is whether the evidence in the record, viewed in the light most favorable to plaintiff, could support a jury verdict that the defendants' actions violated Gordon's constitutional rights while he was in their custody.

■ The law of this circuit governing § 1983 actions arising out of jail suicides is clear. Prison officials violate the civil rights of inmates when they display "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Pretrial detainees, like inmates under active sentence, are entitled to medical attention, and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious medical needs. *Loe v. Armistead,* 582 F.2d 1291, 1294 (4th Cir.1978). This right is "clearly established." *Whisenant v. Yuam,* 739 F.2d 160, 165 (4th Cir.1984).

Relying on *Estelle v. Gamble,* 429 U.S. at 104, 97 S.Ct. at 291, we have applied the standard of "deliberate indifference" to serious psychological conditions of prisoners. *Bowering v. Godwin,* 551 F.2d 44, 47–48 (4th Cir.1977). Specifically, *Lee v. Downs,* 641 F.2d 1117, 1121 (4th Cir.1981), adopts the "deliberately indifferent" standard in holding that "prison officials have a duty to protect prisoners from self-destruction or self-injury." Recently we applied this standard to affirm a judgment against two jailers who placed a prisoner known to have threatened suicide in a cell without surveillance, where he hanged himself. *See Buffington v. Baltimore County,* 913 F.2d 113, 119–20 (4th Cir.1990). Other courts have reached similar conclusions. Stated succinctly, "[t]he key to deliberate indifference in a prison suicide case is whether the defendants knew, or reasonably should have known, of the detainee's suicidal tendencies." *Elliott v. Cheshire County,* 940 F.2d 7, 10–11 (1st Cir.1991) (citation omitted).

The converse of the rule imposing liability is clearly stated in *Edwards v. Gilbert,* 867 F.2d 1271 (11th Cir.1989):

> In the absence of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation ... that has concluded that official conduct in failing to prevent a suicide constitutes deliberate indifference.

867 F.2d at 1275 (footnote omitted).

*Buffington* reiterated this rule by emphasizing that prison officials need not screen a pretrial detainee for suicidal tendencies if they have no knowledge that the prisoner is suicidal. 913 F.2d at 119. It is well settled that officers are entitled to qualified immunity if they had no reason to suspect that the prisoner was a suicide risk. *Belcher v. Oliver,* 898 F.2d 32, 35 (4th Cir.1990); *see also Bell v. Stigers,* 937 F.2d 1340, 1345 (8th Cir.1991); *Kocienski v. City of Bayonne,* 757 F.Supp. 457, 464 (D.N.J.1991); *Christian v. Stanczak,* 769 F.Supp. 317, 322 (E.D.Mo.1991).

### IV

■ Applying the principles pertaining to jail suicides to the instant case, we must examine whether summary judgment was appropriate for each of the appellants. Officers Simmons and Barker were aware that they had been summoned to the Gordon home because of Gordon's suicidal behavior. Simmons discussed this behavior at length with Mrs. Gordon and was aware that Gordon had actually used a weapon in an apparent preparation for a suicide attempt. Simmons also observed Gordon's

erratic behavior and noted that he was intoxicated. Simmons and Barker were sufficiently impressed about Gordon's suicide threat to report it to Lyman before leaving the jail. It is apparent that Simmons and Baker were not deliberately indifferent to Gordon's peril.

■ Lyman understood from his brief conversation with Simmons and Barker the danger of a suicide threat. He filed an arrest report containing a reference to Mrs. Gordon's concern about her husband's suicidal behavior. He took Gordon's belt and presented it to Deputy Smith, stating, "He may try to hang himself. Here is his belt." He then left the jail without speaking to anyone else. The evidence shows that Lyman was sufficiently concerned about suicide to warn Smith. Lyman was not deliberately indifferent with respect to Gordon's suicidal tendencies.

■ Lyman's warning to Smith constituted sufficient notice that a suicide attempt might be imminent. Though Smith at one time denied hearing anything about suicide, he admitted in response to an interrogatory that Lyman told him, "He may try to hang himself. Here is his belt." Smith said that Lyman also warned him that "[y]ou'd better watch this fellow." Smith now claims that Lyman's manner convinced him the warning was not meant seriously, but he failed to make any inquiry of Lyman about his meaning, even though, by his own admission, he could easily have done so. He also failed to make a note of the suicide risk or to summon the jail nurse to screen Gordon for suicidal tendencies, as jail policy required. He simply ignored the information given him by Lyman and passed Gordon on to other officers without transmitting even the bare bones of Lyman's statement.

On the record compiled for summary judgment, a reasonable inference can be drawn that Smith acted deliberately. He does not claim that he forgot the information Lyman gave him or that his other duties prevented him from passing the warning along to other jailers who were Smith's custodians. In the jail suicide context, "[i]ndifference is apathy or uncon-

cern." *Rollgergert v. Cape Girardeau County,* 924 F.2d 794, 797 (8th Cir.1991). Smith's failure to take any action in response to the information he received sustains the district court's denial of his motion for summary judgment.

■ Because Smith did not pass on the information he received from Lyman, there is no basis to support a finding of deliberate indifference against the remaining individual defendants. Lockamy noted that Gordon was nervous, so he called the jail nurse, Gravitt. Neither of them, however, was aware of any suicide threat. The charge that Ramsey was tardy in checking Gordon's cell amounts to no more than a claim of negligence. However, since he had no knowledge of Gordon's suicide threat, Ramsey was not deliberately indifferent to Gordon's danger. A prison official's negligence does not violate the due process clause. *Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986).

■ The distinction between negligence and deliberate indifference applies to jail suicides. For example, in *Freedman v. City of Allentown,* 853 F.2d 1111 (3d Cir. 1988), a prisoner, when asked whether he had scars or identifying marks, displayed "suicide hesitation cuts" but did not report any suicidal behavior or intention on the day of his arrest. 853 F.2d at 1113. Although affirming the dismissal of a § 1983 complaint because the defendants were simply negligent, the court observed:

> When facts have been pled which if proven, would demonstrate that the prison officials actually knew of the suicidal tendencies of a particular prisoner, and ignored their responsibility to take reasonable precautions, the complaint has survived dismissal.

853 F.2d at 1115.

In sum, we conclude that Simmons, Barker, Lyman, Lockamy, Gravitt, and Ramsey are entitled to summary judgment because they were not deliberately indifferent to Gordon's suicide threat.

### V

■■■ Smith, in common with the other appellants, contends that even if he deprived Gordon of a constitutional right to due process, he is protected by the doctrine of qualified immunity, because the right his actions allegedly violated was not clearly established in February 1988.

"[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). At summary judgment, the court must determine whether the rights allegedly violated were "clearly established at the time an action occurred." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. The right must be "clearly established" in "a more particularized, and hence more relevant sense" than simply an abstract statement such as the right to due process. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of preexisting law the unlawfulness must be apparent." 483 U.S. at 640, 107 S.Ct. at 3039 (citation omitted). Rephrasing this well-known principle, the Fifth Circuit has aptly observed: "One need not find a 'goose case' to imbue a warden at a jail with a constitutional duty to protect a prisoner prone to suicide from self-destruction." *Lewis v. Parish of Terrebonne*, 894 F.2d 142, 145 (5th Cir.1990). The limits of qualified immunity are defined essentially in objective terms. "The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts." *Harlow v. Fitzgerald*, 457 U.S. at 819, 102 S.Ct. at 2739.

Smith relies in large part on *Gagne v. City of Galveston*, 805 F.2d 558 (5th Cir. 1986), which the appellants' brief describes as a "case quite similar to that at hand." *Gagne* held that a jailer, who did not remove the belt of a prisoner with suicide scars on his arm or place the prisoner in a surveillance cell, was entitled to qualified immunity. 805 F.2d at 560.

It is readily apparent that there are dispositive distinctions between *Gagne* and Gordon's case. The jailer in *Gagne* had no warning that the prisoner might kill himself. The situation was comparable to the display of suicide scars in *Freedman v. City of Allentown*, 853 F.2d at 1113, which we discussed in part IV above. *Gagne* is also similar to *Belcher v. Oliver*, 898 F.2d at 35, which exonerated a jailer who did not screen for suicidal tendencies. As we pointed out in part III, there are other similar cases. In contrast to the facts in *Gagne, Freedman,* and the *Belcher* line of cases, Smith received a definite, explicit warning from another officer that Gordon might kill himself.

Another significant distinction is that the prisoner's suicide in *Gagne* occurred in 1983, some years before Gordon took his life. In holding that a constitutional duty to protect prisoners from selfdestruction had not at that time been clearly established, the *Gagne* court observed that *Partridge v. Two Unknown Police Officers*, 791 F.2d 1182 (5th Cir.1986), had not yet been decided. *Gagne*, 805 F.2d at 560.

*Partridge* was decided nearly two years before Gordon's suicide. The Fifth Circuit recognized that a complaint that alleged deliberate indifference to a mentally ill pretrial detainee known to have suicide tendencies stated a cause of action for violation of the due process clause. *Partridge*, 791 F.2d at 1185–87. The court explained:

> [J]ust as a failure to act to save a detainee from suffering from gangrene might violate the duty to provide reasonable medical care absent an intervening legitimate governmental objective, failure to take any steps to save a suicidal detainee

may also constitute a due process violation. . . .

791 F.2d at 1187 (footnote omitted).

In a subsequent case, the Fifth Circuit held that a jailer has a "constitutional duty to protect a prisoner prone to suicide from self destruction." *Lewis v. Parish of Terrebonne*, 894 F.2d at 145. The *Lewis* court distinguished *Gagne*, saying, "[t]he custodian in *Gagne* had no knowledge of suicidal tendencies harbored by the detainee." *Lewis*, 894 F.2d at 146. *Gagne* is inappropriate precedent for Gordon's case.

*Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *Partridge*, 791 F.2d 1182 (5th Cir.1986), and our opinions in *Bowering v. Godwin*, 551 F.2d 44, 47–48 (4th Cir.1977), and *Lee v. Downs*, 641 F.2d 1117, 1121 (4th Cir.1981), which were all decided prior to 1988, clearly establish the constitutional duty of a jailer to take reasonable measures to protect a prisoner from self-destruction when the jailer knows that the prisoner has suicidal tendencies.

In *Harlow v. Fitzgerald*, 457 U.S. at 818–19, 102 S.Ct. at 2738, the Supreme Court explained: "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." A claim of "extraordinary circumstances" coupled with a lack of knowledge about the law may establish qualified immunity. 457 U.S. at 819, 102 S.Ct. at 2738. But this record discloses no extraordinary circumstances that would justify Smith's ignoring the warning that Gordon might kill himself. As *Harlow* emphasizes, the test "focuses on the objective legal reasonableness of an official's act." 457 U.S. at 819, 102 S.Ct. at 2738. Applying these principles to Smith's defense of qualified immunity, we must determine whether an officer in his position in light of all the circumstances reasonably could have believed that his failure to take any action did not violate Gordon's constitutional right to protection from self destruction. *See Sevigny v. Dicksey*, 846 F.2d 953, 956 (4th Cir.1988). The district court properly concluded that the facts and inferences reasonably drawn from the facts did not establish as a matter of law that Smith's conduct was objectively reasonable. Consequently, Smith is not entitled to summary judgment on the issue of qualified immunity.

## VI

 Summary judgment must be granted to the city of Charlotte, to Kidd, who is Sheriff of Mecklenburg County, and Lloyd, administrator of the jail, who are sued in their official capacities for allegedly inadequate policies and training. Liability of local governments and their officials sued in their official capacity under § 1983 cannot be based on *respondeat superior* but arises only when city or county officials themselves, through an act establishing a policy or custom, cause the constitutional violation. *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); *Buffington*, 913 F.2d at 123. A plaintiff must identify a deficiency in a training program closely related to the injury complained of and must further show that the injury would have been avoided "under a program that was not deficient in the identified respect." *City of Canton v. Harris*, 489 U.S. 378, 391, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989).

Here the record discloses that police procedure required the officers to notify jail officials of Gordon's suicidal behavior. This they did. Had jail procedure been followed, Smith, in response to Lyman's information about suicide, would have told Lockamy. Gravitt would have been summoned at once to screen Gordon for suicidal tendencies. Had Gravitt concluded that a suicide risk existed, she would, following procedure, have had Gordon stripped and placed in a bare cell, where the means of suicide would not have been available. Mrs. Gordon has shown no act or omission of the two official defendants that caused Gordon's death. She has shown no deficiency in training. The procedures were adequate, and the jailers were aware of them.

The denial of Smith's motion for summary judgment is affirmed. The case is remanded for entry of summary judgment

in favor of the defendants, Kidd, Lloyd, Gravitt, Lockamy, Ramsey, Simmons, Barker, Lyman, and the city of Charlotte, and for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.