28 F.3d 1212
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Ann WARD, as Personal Representative of the Estate of
William E. Ward, III, Plaintiff-Appellee,
v.
Richard HOLMES, in his individual and official capacity as
public safety officer of The City of Cayce,
Defendant-Appellant,
and
CITY OF CAYCE; A.G. Dantzler; Lavern Jumper; Ellie
Huestess, Defendants.
 Nos. 93-2209, 93-2210.
 United States Court of Appeals, Fourth Circuit.
 Argued May 10, 1994.
Decided June 30, 1994.
 
 Appeal from the United States District Court.
 Susan Pedrick McWilliams, Nexsen, Pruet, Jacobs & Pollard, Columbia, SC, for appellants.
 William Gary White, III, Columbia, SC, for appellees.
 Jennifer J. Aldrich, Nexsen, Pruet, Jacobs & Pollard, Columbia, SC, for appellants.
 D.S.C.
 REVERSED AND REMANDED.
 Before WIDENER, WILKINS, and HAMILTON, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 William E. Ward, III (Ward) and Michael Leitzsey (Leitzsey) committed suicide while detained in the City of Cayce, South Carolina jail. Ward's wife, Ann Ward, as Personal Representative of the Estate of William E. Ward, III (Plaintiff Ward), and Leitzsey's mother, Deborah Leitzsey, as Personal Representative of the Estate of Michael Leitzsey (Plaintiff Leitzsey), brought these actions pursuant to 42 U.S.C.A. Sec. 1983 (West 1981), alleging violations of Ward's and Leitzsey's Fourteenth Amendment right to due process.[1] Officers Holmes, Stoudemire, McFaddin, Findley, Wall, Tevepaugh, and Brown appeal the denial by the district court of their motions for summary judgment based on qualified immunity. Because the evidence presented is insufficient to raise a genuine issue of material fact concerning whether these officers were deliberately indifferent to Ward's or Leitzsey's serious medical needs, we conclude that they are entitled to qualified immunity.
 
 I.
 A. FACTS SURROUNDING WARD'S SUICIDE
 
 2
 Viewed in the light most favorable to Plaintiff Ward, the evidence presented demonstrates the following. At 11:20 p.m. on December 10, 1987, Officer Simmons arrested Ward for burglary. Simmons transported Ward to the Cayce jail, where Ward confessed to committing the crime. During his confession, Ward explained that he had a drinking problem. Simmons' affidavit, presented in support of summary judgment, stated that during the hour of contact he had with Ward, Ward did not exhibit any unusual behavior or indicate any intent to harm himself. On the contrary, Simmons believed that Ward exhibited a very casual attitude toward his arrest.
 
 
 3
 After the confession, Ward was taken to the booking area and was left in the custody of Officer Holmes. It is undisputed that Holmes had no prior information concerning Ward, was not present during the confession, and did not have access to a tape recording of the confession. When Holmes asked Ward during the booking process whether he had suicidal thoughts, Ward responded that he did not and appeared calm and in control. Holmes also asked Ward whether he had any scars. Ward indicated that he did not, and Holmes did not notice any. At one point, Ward commented that he wanted his bicycle given to a deserving person.
 
 
 4
 Holmes stated in an affidavit submitted in support of his motion for summary judgment that he removed Ward's belt, as required by jail policy, before placing him in a cell. It is unknown whether Holmes failed to take the belt from Ward or whether Ward retrieved the belt from the desk after Holmes took it from him. In any event, Ward had his belt when he was placed in a cell by Holmes at approximately 1:00 a.m.
 
 
 5
 During a routine inspection at approximately 1:30 a.m., Ward told Holmes that he wanted to telephone his wife to arrange for bail and his employer to notify him that he would not report for work that day. At approximately 1:50 a.m., during Holmes' next inspection, he discovered Ward hanging by his neck from his belt, which was tied to the cell bars. Holmes immediately cut Ward down and examined him for a pulse and respiration. Finding neither, he then ran to the nearby dispatcher's desk to seek assistance. Not more than 30 seconds later, Holmes returned to the cell, encountering two other officers who had arrived to assist. These officers began cardiopulmonary resuscitation while Holmes ran to a firehouse located in the adjacent building to summon paramedics.
 
 
 6
 Other evidence presented by Plaintiff Ward in opposition to summary judgment demonstrated that approximately one month prior to Ward's arrest for burglary, West Columbia, South Carolina police responded to a complaint from Ward's employer. Ward was intoxicated and told those officers that he was contemplating suicide. It is undisputed that Holmes was unaware of this prior incident, that the City of Cayce does not routinely check with other area police departments to ascertain if they have been involved with arrestees, and that there is no established method for sharing such information. Plaintiff Ward's affidavit stated that Ward had a drinking problem for which his family had attempted to have him committed, that Ward had talked to her about his death, and that Ward had a 13-year-old scar on his forearm from a prior suicide attempt.
 
 B. FACTS SURROUNDING LEITZSEY'S SUICIDE
 
 7
 Viewed in the light most favorable to Plaintiff Leitzsey, the evidence demonstrates the following. On May 25, 1989, Plaintiff Leitzsey and her sister, Janet Clayton, contacted Detective D. I. Blackwell to express concern about Leitzsey. Plaintiff Leitzsey told Blackwell that Leitzsey was suicidal and that she feared he would harm himself or others. Blackwell told her that the police could become involved only if she filed formal charges against her son. As a result, Plaintiff Leitzsey filed assault charges, reporting that Leitzsey had struck his ten-year-old sister with his fists and had threatened to strike her with a hammer. No mention was made in Plaintiff Leitzsey's arrest warrant affidavit of any suicidal tendencies on the part of her son.
 
 
 8
 On May 27, 1989, Officer Stoudemire arrested Leitzsey on this charge and transported him to the jail for booking. Stoudemire had not had any prior contact with Leitzsey and was unaware of Plaintiff Leitzsey's conversation with Blackwell. During booking, Stoudemire asked Leitzsey a series of questions, including whether he was contemplating suicide. Leitzsey responded in the negative, and Stoudemire found nothing strange about Leitzsey's behavior. Prior to placing Leitzsey in a cell, Stoudemire permitted Leitzsey to place a telephone call to his mother. Stoudemire witnessed Leitzsey's side of the telephone conversation, which was brief and angry.
 
 
 9
 After placing Leitzsey in a cell, Stoudemire was relieved by Officer McFaddin. Between 7:15 a.m. and 3:30 p.m., McFaddin conducted routine inspections of the detainees, including Leitzsey, approximately every 30 minutes. At the end of his shift, McFaddin asked Leitzsey if he wished to place any more telephone calls. Leitzsey expressed a desire to call his mother, but when McFaddin noticed that Leitzsey's mother had initiated the arrest, McFaddin telephoned her to determine whether she wished to speak with her son. After she indicated that she did not, McFaddin relayed this information to Leitzsey.
 
 
 10
 Officer Findley relieved McFaddin at approximately 3:30 p.m. Findley conducted routine inspections of Leitzsey at 3:30, 4:00, and 4:14 p.m. and did not notice any strange behavior on Leitzsey's part. At approximately 4:37 p.m., Findley found Leitzsey hanging by his neck from a bed sheet that was tied to the top of the cell. The way in which the sheet was tied prevented Findley from opening the cell door without cutting the sheet. Findley, however, did not have a knife with him, so he ran for assistance. Findley returned to the cell with Officer Tevepaugh, cut Leitzsey free, and examined him for a pulse. Leitzsey's color was poor; his fingers were a dark blue, purplish color; and his body felt cool to the officers. They concluded that he was dead and did not begin cardiopulmonary resuscitation. Officer Brown arrived soon thereafter and instructed the two officers not to begin resuscitation. When emergency medical personnel arrived approximately 20 minutes after Leitzsey was discovered, his pupils were fixed and dilated. He was pronounced dead at the scene and was not transported to a hospital. The time of death was estimated by emergency medical personnel as 4:30 p.m.
 
 
 11
 Other evidence presented in opposition to summary judgment indicated that in the months prior to Leitzsey's suicide Cayce officers had responded to several incidents in which Leitzsey had been involved. Tevepaugh and Wall responded to an incident at Leitzsey's home on March 3, 1989 when Leitzsey slashed his wrist with a razor blade; thus, their involvement in this incident provided them with knowledge of Leitzsey's suicidal tendencies. Brown approved the incident report concerning this March 3rd episode.
 
 C. PROCEEDINGS IN THE DISTRICT COURT
 
 12
 Following discovery, all Defendants moved for summary judgment. The district court granted summary judgment in favor of the City of Cayce, holding that the record was devoid of evidence from which a jury could conclude that a policy or failure to train officers in suicide prevention actually or proximately caused the death of Ward or Leitzsey. In addition, the court granted summary judgment in favor of officials Dantzler, Jumper, and Huestess.[2] The district court, however, denied the motions for summary judgment in which the officers asserted that they were entitled to judgment on the basis of qualified immunity. In its order denying summary judgment to Stoudemire, McFaddin, Findley, Wall, Tevepaugh, Brown, and Blackwell in the Leitzsey proceeding, the district court stated in pertinent part:
 
 
 13
 Plaintiff [Leitzsey] has presented evidence in response to the defendants['] motion for summary judgment concerning [Leitzsey's] suicidal tendencies and of the defendants['] knowledge of that fact, and that she asked them to incarcerate [Leitzsey] for his own protection. Under these facts and under the principles above stated, the defendants' motion on principles of qualified immunity must be denied.
 
 
 14
 In the Ward proceedings, the district court denied summary judgment to Holmes, stating that summary judgment was inappropriate for the reasons set forth in its order denying summary judgment to the officers in the Leitzsey case. With the exception of Blackwell,[3] each of these officers appeals the denial of summary judgment, arguing that he is entitled to qualified immunity.[4]
 
 II.
 
 15
 Summary judgment is proper if, viewed in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir.1985). The nonmoving party is entitled to the most favorable inferences that may reasonably be drawn from the forecast evidence, Ross, 759 F.2d at 364, but the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another," Beale v. Hardy, 769 F.2d 213, 214 (4th Cir.1985). The essence of the inquiry the court must make is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). "[I]f the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party," summary judgment should be granted. Id. at 248. We review de novo the decision of the district court to grant summary judgment.
 
 
 16
 Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir.1988).
 
 
 17
 An official is entitled to qualified immunity when his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). This court has explained:
 
 
 18
 In analyzing the appeal of a denial of summary judgment on qualified immunity grounds, it is "necessary first to identify the specific constitutional right allegedly violated, then to inquire whether at the time of the alleged violation it was clearly established, then further to inquire whether a reasonable person in the official's position would have known that his conduct would violate that right."
 
 
 19
 Gordon v. Kidd, 971 F.2d 1087, 1093 (4th Cir.1992) (quoting Collinson v. Gott, 895 F.2d 994, 998 (4th Cir.1990)).
 
 
 20
 The Due Process Clause of the Fourteenth Amendment provides to pretrial detainees "a right to be free from any form of punishment." Belcher v. Oliver, 898 F.2d 32, 34 (4th Cir.1990). "The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee." Id. A significant risk of suicide constitutes a serious medical need, and thus a prison official's deliberate indifference to such a risk is violative of the Fourteenth Amendment. Gordon, 971 F.2d at 1094. A prison official is deliberately indifferent only if he knows that a detainee "face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 62 U.S.L.W. 4446, 4452 (U.S. June 6, 1994). Thus, "[i]t is well settled that officers are entitled to qualified immunity if they had no reason to suspect that [a] prisoner was a suicide risk." Gordon, 971 F.2d at 1094. Knowledge of a detainee's suicidal tendencies is not imputed to officers who are unaware of the risk. See id. at 1095. In addition, an officer's failure to afford suicide screening does not violate the Fourteenth Amendment. Belcher, 898 F.2d at 34-35. And, in the absence of objective evidence of a serious risk of suicide, the failure to remove a pretrial detainee's belt does not rise to the level of deliberate indifference, even if the failure violates jail policy. Id. at 35-36.
 
 
 21
 In sum, the parameters of a pretrial detainee's right to be free from deliberate indifference by government officials to serious medical needs, including the right to be free from deliberate indifference to a serious risk of suicide, were clearly established at the time of these incidents. See Gordon, 971 F.2d at 1094.
 
 III.
 
 22
 Plaintiff Ward claims that Officer Holmes violated Ward's Fourteenth Amendment right to due process in two ways. First, she contends that Holmes was deliberately indifferent to Ward's serious need for protection from his suicidal tendencies. And second, she asserts that Holmes was deliberately indifferent to Ward's serious need for medical attention after Holmes discovered Ward hanging in his cell. Holmes responds that the evidence is insufficient to raise a genuine issue of material fact concerning whether he was deliberately indifferent to either of these medical needs and, therefore, that he is entitled to qualified immunity.
 
 
 23
 A. DELIBERATE INDIFFERENCE TO WARD'S RISK OF SUICIDE
 
 
 24
 Although it is undisputed that Holmes had no knowledge of Ward prior to booking him in the early morning hours of December 11, 1987, Plaintiff Ward argues that information Holmes learned after he came into contact with Ward should have indicated to him that Ward suffered from suicidal tendencies. Plaintiff Ward first asserts that a scar across Ward's wrist was readily observable and that Holmes should have noticed it during his routine booking of Ward. However, even if Holmes had noticed the scar, his failure to recognize that it was the result of a previous suicide attempt amounted at most to simple negligence.[5] Deliberate indifference, not negligence, is required to establish a violation of the Fourteenth Amendment. See Freedman v. City of Allentown, Pa., 853 F.2d 1111, 1116 (3d Cir.1988) ("[A]ssum[ing] that a reasonably competent prison official should have known and identified [scars shown to them by the detainee] as 'suicide hesitation cuts,' ... the failure to recognize them as such, without more, amounts only to negligence and therefore fails to support a claim under section 1983.").
 
 
 25
 Plaintiff Ward next points to Ward's statement that his bicycle should be given to a deserving person. It is undisputed that Holmes was unaware of any perceived value of Ward's bicycle and that the way Ward made the statement was consistent with a recognition that he would be incarcerated for an extended period for burglary. In addition, only minutes later, Ward inquired of Holmes about placing telephone calls to his wife to arrange bail and to his employer to inform him that he would not be reporting for work. Under these circumstances, Holmes' failure to appreciate the significance of Ward's statement concerning the bicycle as indicating suicidal tendencies on Ward's part was not evidence of deliberate indifference.
 
 
 26
 Plaintiff Ward also argues that Holmes knew that alcoholism puts one at increased risk of suicide and that Holmes could have easily discovered that Ward had a drinking problem. Nevertheless, the evidence is undisputed that Holmes was not present during Ward's confession, in which he indicated that he had a drinking problem, nor was Holmes otherwise aware of the problem. In addition, this court has rejected the argument that officers have a duty to screen for suicidal tendencies. See Belcher, 898 F.2d at 34-35. Thus, Holmes had no duty to ascertain whether Ward had a drinking problem.
 
 
 27
 Finally, Plaintiff Ward submitted the deposition testimony of Gordon C. Kamka, Director of the Facilities Review Panel for the State of West Virginia, who opined that the actions of the officers evinced deliberate indifference to the detainees' risk of suicide. With respect to Holmes, the only officer directly involved in the Ward action, Kamka opined simply that his opinion was the same as the one he had previously given with respect to the officers involved in the Leitzsey proceedings. For the reasons set forth more fully below, Kamka's testimony does not raise a genuine issue of material fact concerning whether Officer Holmes was deliberately indifferent to a risk of suicide by Ward. Thus, we conclude that Holmes is entitled to qualified immunity on Plaintiff Ward's claim that he was deliberately indifferent to Ward's serious risk of suicide.
 
 
 28
 B. DELIBERATE INDIFFERENCE TO WARD'S NEED FOR RESUSCITATION
 
 
 29
 Plaintiff Ward also maintains that Holmes was deliberately indifferent to Ward's serious need for medical attention after he found Ward hanging in his cell. The basis for this claim is that Holmes did not immediately begin to administer cardiopulmonary resuscitation upon finding Ward, but instead went for assistance. In addition, Plaintiff Ward asserts that Holmes exhibited deliberate indifference by going to seek assistance from paramedics at the firehouse. We disagree. Holmes left Ward unattended for only a matter of seconds while he went to seek assistance at the dispatcher's desk. Upon his return, he encountered other officers who began resuscitation. Holmes then left Ward in their care while summoning paramedics. These actions simply do not evince deliberate indifference.[6]
 
 
 30
 Based on the foregoing, we conclude that the evidence is insufficient to raise a genuine issue of material fact concerning whether Holmes was deliberately indifferent to Ward's serious medical needs.
 
 
 31
 Thus, we reverse the decision of the district court and hold that Holmes is entitled to qualified immunity.
 
 IV.
 
 32
 A. DELIBERATE INDIFFERENCE TO LEITZSEY'S RISK OF SUICIDE
 
 1. Officer Stoudemire
 
 33
 Although it is undisputed that Officer Stoudemire had no knowledge of Leitzsey's suicidal tendencies prior to arresting him, Plaintiff Leitzsey asserts that Stoudemire was deliberately indifferent to a serious risk of suicide by Leitzsey because Leitzsey had large, recent scars on both of his arms; Stoudemire witnessed a conversation between Leitzsey and his mother that upset Leitzsey; and as reflected on the booking report, Stoudemire knew that Leitzsey had a history of drug use. In addition, Plaintiff Leitzsey relies on the fact that Leitzsey's prior suicide attempt was referenced in incident reports on file with the City of Cayce.
 
 
 34
 Stoudemire's failure to recognize that the scars on Leitzsey's arms, Leitzsey's telephone call to his mother, and Leitzsey's history of drug use indicated suicidal tendencies on his part was at most simple negligence. Moreover, because there is no requirement that officers screen detainees for a risk of suicide, Stoudemire's failure to investigate the prior incident reports does not amount to deliberate indifference. Thus, because Stoudemire had no reason to know that Leitzsey had suicidal tendencies, Stoudemire is entitled to qualified immunity.
 
 2. Officer McFaddin
 
 35
 Plaintiff Leitzsey maintains that Officer McFaddin was deliberately indifferent to her son's serious risk of suicide for essentially the same reasons as were asserted for Stoudemire--scars on Leitzsey's arms, Leitzsey's history of drug use as indicated on the booking report, and McFaddin's knowledge that Leitzsey had an angry conversation with his mother. Again, this evidence is insufficient to show that McFaddin had any reason to believe that Leitzsey posed a risk of suicide.
 
 
 36
 Accordingly, for the reasons set forth above, we conclude that McFaddin is entitled to qualified immunity.
 
 3. Officer Findley
 
 37
 Plaintiff Leitzsey argues that Officer Findley was deliberately indifferent to Leitzsey's serious risk of suicide because Findley had the warrant and booking report, Leitzsey would not talk to Findley when he checked on him, and Findley knew that Leitzsey had an upsetting conversation with his mother. However, neither the arrest warrant nor the booking report indicated that Leitzsey was at risk for suicide. Further, failing to recognize Leitzsey's quiet demeanor or upsetting telephone call as indicators that Leitzsey was at risk for suicide was at most simple negligence. Thus, we conclude that Findley had no reason to suspect that Leitzsey presented a serious risk of suicide and that Findley is entitled to qualified immunity on the claim that he was deliberately indifferent to Leitzsey's risk of suicide.
 
 4. Officers Wall, Tevepaugh, and Brown
 
 38
 Officers Wall and Tevepaugh had responded to prior incidents at the Leitzsey home and were aware of Leitzsey's suicidal tendencies. In addition, Officer Brown's approval of the incident report detailing Leitzsey's prior suicide attempt is sufficient to raise a genuine issue of material fact concerning whether Brown had prior knowledge of Leitzsey's suicidal tendencies. However, Plaintiff Leitzsey presented no evidence that these officers were aware that Leitzsey would be, or had been, taken into custody on May 27, 1989. Accordingly, the evidence cannot support a finding that these officers were deliberately indifferent to the risk that Leitzsey might commit suicide during his incarceration. Further, while in some instances a failure to relay information that a detainee is suicidal may amount to deliberate indifference, see Gordon, 971 F.2d at 1095, in the absence of any evidence tending to demonstrate that these officers were aware that Leitzsey would be, or had been, taken into custody, we cannot conclude that their failure to do so constituted deliberate indifference.
 
 
 39
 Finally, Plaintiff Leitzsey argues that these officers should have developed a general list of individuals with suicidal tendencies who might be detained in the future for reference by officers responsible for those incarcerated at the jail. However, Plaintiff Leitzsey cites no legal authority imposing such a duty. In the absence of a clearly established duty for the officers to do so, we conclude that they are entitled to qualified immunity.[7]
 
 
 40
 B. DELIBERATE INDIFFERENCE TO LEITZSEY'S NEED FOR RESUSCITATION
 
 
 41
 Plaintiff Leitzsey also claims that Officers Findley, Tevepaugh, and Brown were deliberately indifferent to her son's serious need for medical treatment after he was discovered hanging in his cell. We disagree. When Findley and Tevepaugh examined Leitzsey, they found no pulse or respiration. Based on the absence of pulse and respiration, in combination with Leitzsey's appearance and the temperature of his body, Findley and Tevepaugh believed that Leitzsey was dead. Shortly thereafter, Brown arrived and directed that the officers not begin resuscitation. Because the officers believed that Leitzsey was dead, their failure to attempt to resuscitate him was at most negligence. Therefore, they are entitled to qualified immunity.
 
 V.
 
 42
 Having concluded that summary judgment in favor of all Appellants on Plaintiffs' Sec. 1983 claims should have been granted, the only claims remaining against these officers are state-law claims.[8] On remand the district court should consider whether dismissal of these claims is appropriate. See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).
 
 REVERSED AND REMANDED
 
 
 [1]
 Although Plaintiffs Ward and Leitzsey originally brought their claims as one action, the district court severed the actions. Defendants in the Ward action were the City of Cayce, A. G. Dantzler, Lavern Jumper, Ellie Huestess, and Officer Richard Holmes. Defendants in the Leitzsey action were the City of Cayce, A. G. Dantzler, Lavern Jumper, Ellie Huestess, and Officers Emerson R. Stoudemire, Daniel McFaddin, Bill Findley, Ken Wall, William S. Tevepaugh, Danny Brown, and D. I. Blackwell
 In addition to their Sec. 1983 claims, Plaintiffs also pursued state-law claims. See S.C.Code Ann. Sec. 15-78-60(25) (Law. Co-op. Supp.1993) (abrogating sovereign immunity when governmental entity exercises a responsibility or duty to a prisoner in a grossly negligent manner); Id. Sec. 15-78-70(a)-(b) (Law. Co-op. Supp.1993) (providing exclusive remedy in tort for those injured by governmental employees acting within the scope of their official capacities and providing that such employees may be held liable if they acted with an intent to harm).
 
 
 [2]
 Although it was undisputed that Dantzler, Jumper, and Huestess had no direct involvement with either Ward or Leitzsey, Plaintiffs had alleged that these officials failed to train adequately the officers involved. This court dismissed as premature a cross appeal by Plaintiffs concerning the grant of summary judgment to these officials, as well as a cross appeal of the grant of summary judgment to the City of Cayce
 
 
 [3]
 Plaintiff Leitzsey's evidence was sufficient to raise a genuine issue of material fact concerning whether Blackwell knew of Leitzsey's suicidal tendencies and that Leitzsey would be brought into custody. He has not appealed the denial of qualified immunity by the district court
 
 
 [4]
 This court consolidated the appeals
 
 
 [5]
 Here, and in similar statements throughout this opinion, we do not suggest that the officers were in fact negligent, only that under a strained interpretation of the facts a finding of simple negligence is the outside limit of the degree of culpability that could be assigned
 
 
 [6]
 Plaintiff Ward attempts to make much of a perceived time discrepancy among the reports of the officers who were involved in resuscitation efforts and argues that this discrepancy could lead to the inference that up to seven minutes passed before officers began resuscitation. Holmes reported that he found Ward at 1:50 a.m. According to Officer Michael Tablas, it was approximately 1:55 a.m. when he met Holmes in the hall as Holmes returned from the dispatcher's desk. Officer Glenn Bridgeford, the other officer who met Holmes upon his return from the dispatcher's desk, estimated that it was approximately 1:57 a.m. when he met Holmes in the hallway. In our view, these different time estimates do not permit an inference of deliberate indifference on Holmes' part. All of the times are approximations. Further, upon discovering Ward, Holmes opened the cell, cut through Ward's belt with a knife, checked Ward for a pulse, and then ran for assistance. Undoubtedly these actions required some period of time, assuming they were done as quickly as possible, and likely account for some of the time lapse urged by Plaintiff Ward
 
 
 [7]
 Plaintiff Leitzsey offered the deposition testimony of Gordon Kamka, Director of the Facilities Review Panel for the State of West Virginia, in opposition to summary judgment. Kamka opined that Defendants had been deliberately indifferent to Leitzsey's risk of suicide in a number of ways, including "[t]he failure to properly supervise, the failure to properly search, the provision of instruments that could be used in suicide, the failure to properly observe, the failure to attempt to revive, [and t]he failure to acknowledge information from the family, putting [Defendants] on notice as to suicide potential."
 The first basis for Kamka's opinion--inadequate supervision of the officers--is not relevant in determining whether the individual officers were deliberately indifferent. In addition, as Kamka acknowledged, his opinion that the officers failed to search and observe adequately the detainees and to ensure that they had no instruments that could aid a suicide attempt only became relevant if the officers had a reason to believe that a detainee posed a risk of suicide. Because we have concluded that none of the officers involved with the detainees had such information, Kamka's opinion concerning these alleged failures does not raise a genuine issue of fact concerning whether these officers exhibited deliberate indifference to the detainees. Moreover, to the extent that Kamka's opinion suggests that the officers' failure to observe properly the detainees' scars constituted deliberate indifference, his opinion conflicts with the decision of this court that the failure to recognize the significance of such scars constitutes at most negligence. See Gordon, 971 F.2d at 1095. Kamka's opinion that the officers should have acted on the information provided by Leitzsey's family concerning his risk of suicide provides no basis for concluding that the officers who were ignorant of this information were deliberately indifferent. And, Kamka's opinion that those officers who knew about Leitzsey's suicidal propensities should have acted is inapplicable because none of the officers involved in this appeal who had such information were aware that Leitzsey would be, or had been, placed in custody. Finally, Kamka's opinion that a list of suicidal persons who might become detainees should have been established is irrelevant to the determination of whether these officers were entitled to qualified immunity due to the absence of any clearly established duty for the officers to maintain such a list. In sum, none of the bases upon which Kamka offered his expert opinion that these officers were deliberately indifferent to the detainees' risk of suicide are sufficient to raise a genuine issue of material fact necessitating trial.
 
 
 [8]
 The officers argue that the district court erred in failing to grant summary judgment on the state-law claims, asserting that the evidence presented is insufficient to raise a genuine issue of material fact concerning whether they acted with an intent to harm the detainees as required under S.C.Code Ann. Sec. 15-78-70 (Law. Co-op. Supp.1993). Section 15-78-70 provides in pertinent part:
 (a) This chapter constitutes the exclusive remedy for any tort committed by an employee of a governmental entity. An employee of a governmental entity who commits a tort while acting within the scope of his official duty is not liable therefor except as expressly provided in subsection (b).
 (b) Nothing in this chapter may be construed to give an employee of a governmental entity immunity from suit and liability if it is proved that the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, [or] intent to harm....
 It appears undisputed that the officers were employees of a governmental entity acting in their official capacities during the events at issue and that they did not intend to harm the detainees. Although we are unable to discern why the district court failed to grant summary judgment in favor of the officers on the state-law claims, this issue is not properly before us, and consequently we express no opinion on it, leaving it for the district court to consider on remand.