Eva RUSSELL, as the Personal Representative of the Estate of Kevin W. Brochu, Plaintiff,

v.

KNOX COUNTY, et al., Defendants.

Civ. No. 92–172–P–C.

United States District Court, D. Maine.

June 21, 1993.

Stuart Tisdale, Portland, ME, for plaintiff.

William Fisher, Monaghan, Leahy, Hochadel & Libby, Portland, ME, for defendants.

## BENCH RULING

GENE CARTER, Chief Judge.

(Ruling of the Court after motion for judgment as a matter of law made before Honorable Gene Carter in the United States District Court, Portland, Maine, on the 14th day of May, 1993, beginning at 1:32 p.m., as follows:)

THE COURT: The matter is before the Court on a motion for judgment as a matter of law at the conclusion of Plaintiff's case.

In ruling on that motion, the Court is required to take the evidence in the light that is most favorable to the nonmoving party, here the Plaintiff, and to indulge all reasonable inferences to be drawn from the evidence so viewed as are in favor of the nonmoving party.

This is a section 1983 civil rights action, and in order to establish a claim, it must be established that there was deliberate indifference to a clearly established constitutional right.

The case of *Gordon v. Kidd*, 971 F.2d 1087 (4th Cir.1992), at 1097, has the following to say about that:

> *Estelle v. Gamble*, 429 U.S. 97 [97 S.Ct. 285, 50 L.Ed.2d 251 (1976)]; *Partridge [v. Two Unknown Police Officers of Houston*, 791 F.2d 1182 (5th Cir.1986)] and our opinions in *Bowering v. Godwin*, 551 F.2d 44 [(4th Cir.1977)] and *Lee v. Downs*, 641 F.2d 1117, 1121 (4th Cir.1981), which were all decided prior to 1988, clearly establish the constitutional duty of a jailer to take reasonable measures to protect a prisoner from self-destruction when a jailer knows that the prisoner has suicidal tendencies.

That statement in *Gordon v. Kidd* was elicited by a reference to the conclusion to the contrary reached in *Gagne v. City of Galveston*, 805 F.2d 558 (5th Cir.1986). The comment I have just read from the *Gordon* case was intended to respond to the conclusion in *Gagne* that there was no clearly established constitutional right of an involuntarily confined inmate to a reasonably safe place of confinement.

Several circuits have since followed the lead of the *Gordon* case and, as I have previously indicated in discussions with counsel, one of those cases is *Bowen v. City of Manchester*, 966 F.2d 13 (1st Cir.1992), in which the Court of Appeals for the First Circuit observes, "[b]y 1986 it was clearly established that police officers violate the fourteenth amendment due process right of a detainee if they display a 'deliberate indifference' to the unusually strong risk that a detainee will commit suicide."

That is a 1992 case; it refers to that right being established at least by 1986, which is prior to 1991, the date of Kevin Brochu's suicide in this case.

So, I am satisfied that there is a constitutional right clearly established as of August 12, 1991, of an inmate, involuntarily detained, to a reasonably safe place of confinement, at least to the extent that it requires that there not be deliberate indifference to an unusually strong risk that the detainee will commit suicide.

With respect to the individual Defendants here, it must be established that they acted with "deliberate indifference" to a known right.

The First Circuit has said that such conduct must encompass " 'acts or omissions so dangerous (in respect to health and safety) that a defendant's knowledge of a large risk can be inferred.' " *Elliott v. Cheshire County, New Hampshire*, 940 F.2d 7, 10 (1st Cir.1991). The United States Supreme Court has said that the purpose of a qualified immunity doctrine which is implemented by the deliberate indifference standard is to "protect all but the plainly incompetent or those who knowingly violate the law."

And, the Court also refers to the *Manarite* case where the Court noted: "[n]o case finds a supervisor 'deliberately indifferent' (or the like) simply because he does not react when he learns of a significantly increased suicide attempt rate. Courts, including this one, have found supervisors to be deliberately indifferent only where a much fuller record than we have before us shows significantly more culpable behavior (or omissions)." *Manarite v. City of Springfield*, 957 F.2d 953, 958 (1st Cir.1992).

And the conclusion in *Manarite*, on the facts there, makes it clear that this standard of deliberate indifference is intended to be a high standard of misconduct, that it has a very significant bite to it in protecting officers from the need to have their discretionary judgments become a basis for litigation and ultimate liability.

The factual circumstances of that case, as the Court has noted in colloquy with counsel, are significantly different from this case, but nonetheless indicate that the Court of Ap-

peals at least takes a very strong stand in favor of a high level protection for officers in the performance of such functions.

■ With respect to the County, in this case the Plaintiff must prove the existence of a policy, which is the moving force in producing the injury, namely the death of Kevin Brochu. Taking all of those rules of law into account, the Court will grant the motion as to the Defendant County of Knox, the Defendant Davey, and the Defendant Cooley. The Court's reasoning is as follows.

With respect to the County of Knox, it is clear that there must be a policy in place on behalf of the County, or a policymaking mechanism, which is the moving force in producing the injury.

Here, the undisputed evidence is that on April 20th, or some time thereabouts, when Mr. Brochu was first admitted, on the occasion of his incarceration leading to his death, or some time thereafter, his laces were taken away from him. The contention of the Plaintiff here is that it was the availability of the laces to the deceased that constituted the deliberate indifference violation.

It is clear to the Court that with the taking away of the laces, the policy established by the evidence of letting all inmates in the Knox County Jail keep their laces ceased to be a moving force, and that the availability of the laces came about as a moving causative force in bringing about Kevin Brochu's death only because of the independent, one-time decision by the Defendant Voyer. Accordingly, it is clear to this Court that the County is not liable and may not be subjected to liability on the basis of an asserted claim that a policy of the County brought about the death of Kevin Brochu.

With respect to the Defendant Davey, it is clear and undisputed on the evidence that he did not do any act, make any judgment, or omit to act in any way directly with respect to the circumstances of confinement of Kevin Brochu. Absent that, as conceded by Plaintiff's counsel, the only basis for him to be found liable is on the basis that he made or implemented a policy that resulted, as a moving force, in the death of Kevin Brochu. By reason of the prior determination, and by reason of the fact that the evidence reflects the only policy that he was at all involved in that could have had such an effect was the policy that permitted all inmates to retain their shoe laces when incarcerated in Knox County Jail. He cannot be held liable on that basis because, as the Court has already determined, the intervening decision to take away the laces, in which he did not participate, on the undisputed evidence, and the also intervening independent decision of Major Voyer to return the laces, completely cuts off the causative effect of that policy. Accordingly, the motion is *GRANTED* as to Defendant Davey.

■ With respect to the Defendant Cooley, the issue is in some respects somewhat more narrowly drawn, but I am satisfied that there is no basis on this evidence for him to ultimately be found liable, on this record, for the death of Kevin Brochu.

The evidence reflects, undisputedly, that Officer Cooley was a line corrections officer in the Knox County Jail. It reflects that he had no role whatever in making policy in respect to conditions of confinement of inmates, no role, so far as the record reflects, in amending or abrogating policies in place. It reflects that the decision to return the laces was made by Major Voyer. The record reflects, by inferences if not directly, that Officer Cooley was required to follow the directions and orders of his superiors, including Major Voyer, and the record reflects that he did so.

The record further reflects, by undisputed evidence, that with a single possible exception, he made checks upon Kevin Brochu while he was on duty; that he, Cooley, was on duty during the period that Brochu was incarcerated from April to August of 1991, that he made the checks regularly at 15-minute intervals. There is no real dispute about that, and that he did so pursuant to a policy placed in force by his superiors, the County, and through Major Voyer. He fully observed that policy. The only question that could be raised on this record about that is raised by the testimony of William Brown.

The Court has considered that testimony and its implications with great care in light of

Officer Cooley's clear testimony that he checked Kevin Brochu at 23:15 on the night of the suicide, before he went downstairs for a period of four minutes to go to the bathroom. The testimony of William Brown is very nonspecific in particulars. The Court does not undertake to resolve, as it cannot on this motion, any question about the credibility of William Brown. Carefully considering the testimony, its vagueness, and the fact that he recanted on cross-examination much of the testimony that he had given on direct examination, the Court concludes that his testimony does not directly contradict, confute, or otherwise impeach the testimony of Officer Cooley that he did check Kevin Brochu at 23:15 before he went downstairs and that he did that in the day room.

The record will reflect that the Court is well aware of the layout of the jail and has observed that it was thoroughly possible for Officer Cooley to progress from William Brown's cell, if the conversation Brown testified to did occur in close proximity to the time of 23:15, check the Defendant in the day room hastily, and go down the stairs for the four-minute period that he required to relieve himself.

With that in mind, the Court has a clear conclusion that he cannot be found liable, on this record, that he did everything that was within his authority to do in carrying out the policies of the jail in respect to the safety of Kevin Brochu, and that there is no basis upon which he can be found liable.

The Court will go further and say, in view of the strictness, as articulated by the Court of Appeals for the First Circuit (as well as by opinions from other circuits), particularly with respect to the deliberate indifference standard, that even if the Court were convinced that William Brown's testimony did contradict Officer Cooley's testimony, leading the Court to the conclusion that he did not check, as he testified, Kevin Brochu at 23:15 before going downstairs, that in all the circumstances disclosed by the evidentiary record in this case, such conduct would not constitute "deliberate indifference" to a known elevated risk of suicide on the part of Kevin Brochu. There was compelling need for him to take that absence, he had never

been told anything by Kevin Brochu that would indicate that he intended to commit suicide. He had a long, continued exposure to Kevin Brochu. Cooley said that he was surprised that Brochu committed suicide. That means that his state of mind was that he did not have any concerns for self-destruction on the part of Kevin Brochu. On this record, that appears without evidentiary dispute to be reasonable.

And the fact that Brochu was on a suicide watch, even a serious suicide watch, does not render a four-minute absence for the purpose in question, under all of the circumstances, conduct that is so seriously in breach of his obligations as a correction officer at the Knox County Jail as to approach wantonness, recklessness, or careless indifference to the well-being of Kevin Brochu because of a known suicide risk.

With respect to Major Voyer, the Court reserves decision pending the completion of all of the evidence in the case. The Court has concern, as I have perhaps indicated in colloquy with counsel, that it is his decision that becomes the moving force. I should say that that decision does not bind the County as a matter of fact or policy because it is a single, independent decision, not intended to relate to anything other than the single instant of determining whether a single inmate, namely, Kevin Brochu, should have his shoe laces. The fact that Officer Voyer has made a decision does not necessarily mean that it is a policy decision, and I find that it was not a policy decision and, for that reason, it does not implicate the County or Sheriff Davey.

But it is clear that that decision, made at the behest of Lieutenant Sproul, is the moving cause to Kevin Brochu having his shoe laces available to him in a cell with a coat hook under circumstances such that he could use the laces to take his own life. That decision was made in the face of an expert psychiatric diagnosis to the effect that Kevin Brochu was a "suicide risk." As of August 2, it is clear, from this record and the note made in the "Pass–On" book, that Major Voyer knew that it was a serious suicide risk because he put in place what he characterized as "a serious suicide watch" and in-

structed the line staff "to keep a close eye" on Kevin Brochu.

Now, I recognize that there is much in this record that may conflict with the doctor's diagnosis. Kevin Brochu may have dissembled about what his plans with respect to suicide were, he may have kept information from the line staff officers as to what he did intend and if he did intend suicide. He may have said things to his mother that were inconsistent with an intent to commit suicide. But this case has in it that single fact of an expert psychiatric diagnosis, sought by the jail staff through its leadership, for the specific purpose of determining how Brochu should be treated, and that makes it different from any other case that I have reviewed. I have concern that giving this inmate his shoe laces, in the face of that diagnosis and in the face of everything that was known about this inmate, and in the face of the fact that this diagnosis had been accepted at least to the extent of imposing a suicide watch, ultimately characterized as "a serious suicide watch," may well constitute a level of deficient performance in the duties of the jail administrator sufficient to qualify as recklessness or a wanton disregard of, or a callous indifference to, the known risk that Kevin Brochu would commit suicide.

I am going to hear the rest of the evidence before I resolve that issue and, therefore, the motion will be taken under advisement. Decision is RESERVED, and the case will go forward only as to Major Voyer on Monday morning at 8:30.

Anything further from counsel at this time?

MR. TISDALE: No, Your Honor.

THE COURT: I'll see counsel briefly in chambers. The Court will be briefly in recess.

[The case was settled before trial recommenced.]

[The Bench Ruling was edited by the Court for style, grammar, punctuation, and accuracy of citation.]